**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

JAMES RAY CHAMBERS, :
:
      Plaintiff, :
: CIVIL ACTION NO.
      v. : 1:11-cv-02412-TWT-RGV
:
MICHAEL J. ASTRUE, :
*Commissioner of Social Security,* :
:
      Defendant. :

## ORDER FOR SERVICE OF FINAL REPORT AND RECOMMENDATION

Attached is the Final Report and Recommendation of the United States

Magistrate Judge made in this action in accordance with 28 U.S.C. § 636(b)(1),

Federal Rule of Civil Procedure 72(b), and this Court's Local Rule 72.1. Let the same

be filed and a copy, together with a copy of this Order, be served upon counsel for

the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any,

to the Report and Recommendation within fourteen (14) days of the receipt of this

Order. Should objections be filed, they shall specify with particularity the alleged

error or errors made (including reference by page number to the transcript if

applicable) and shall be served upon the opposing party. The party filing objections

will be responsible for obtaining and filing the transcript of any evidentiary hearing

for review by the district court. If no objections are filed, the Report and Recommendation may be adopted as the opinion and order of the district court and any appellate review of factual findings will be limited to a plain error review. United States v. Slay, 714 F.2d 1093 (11th Cir. 1983) (per curiam).

The Clerk is directed to submit the Report and Recommendation with objections, if any, to the district court after expiration of the above time period.

**IT IS SO ORDERED**, this 11th day of January, 2013.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

JAMES RAY CHAMBERS,      :
                            :

        Plaintiff,        :

                            :        CIVIL ACTION NO.
        v.             :        1:11-cv-02412-TWT-RGV

                            :

MICHAEL J. ASTRUE,        :
*Commissioner of Social Security,*  :

                            :

        Defendant.      :

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

This is an action to review the determination by the Commissioner of Social Security ("the Commissioner") that claimant, James Ray Chambers ("claimant"), proceeding *pro se*, is not entitled to a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433 ("the Act"). For the reasons set forth herein, it is **RECOMMENDED** that the Commissioner's decision denying DIB be **AFFIRMED**.

## I. PROCEDURAL HISTORY

Claimant initially filed an application for DIB on April 25, 2005, alleging disability commencing on October 30, 2004, due to coronary artery disease, degenerative disc disease, asthma, arthritis, radiculopathy, chronic obstructive pulmonary disease ("COPD"), chronic neck and back pain, tinnitus, hypertension,

and post traumatic stress disorder ("PTSD"). (Tr.[1] at 21, 24-26, 90-95, 104, 190). Claimant's application was denied initially and on reconsideration. (Tr. at 47-52, 55-59). Claimant then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on April 3, 2009. (Tr. at 17-46, 60-61). On September 1, 2009, the ALJ, Heather Joys, issued a decision denying claimant's application on the grounds that he had not been under a "disability" as defined by the Act from October 30, 2004, through the date of her decision. (Tr. at 4-16). Claimant sought review by the Appeals Council, and on May 17, 2011, the Appeals Council denied claimant's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. at 1-2, 1122-24).

Claimant appealed the decision to the district court on July 22, 2011, seeking review of the Commissioner's decision. [Doc. 1]. The matter is now before the

---

[1] See Document 6 and its attachments for the electronic Certified Administrative Record ("eCAR"), hereinafter referred to as ("Tr. at __"). With the exception of the eCAR, which is cited according to the actual transcript page number shown on the bottom of the record, the cited document and page numbers in this Report and Recommendation refer to the document and page numbers shown on the Adobe file reader linked to this Court's electronic filing database (CM/ECF).

Court upon the administrative record and the parties' briefs[2] and is ripe for review

pursuant to 42 U.S.C. § 405(g).

## II. ISSUES

Claimant has raised the following issues in this case:

1.    Whether the ALJ erred in finding that claimant could perform his past relevant work by failing to properly evaluate the medical evidence of record and therefore formulating an improper residual functional capacity ("RFC") assessment;

2.    Whether the ALJ erred at step two of the sequential analysis by failing to find claimant's PTSD and tinnitus were severe impairments; and

3.    Whether substantial evidence supports the ALJ's credibility findings.

[Doc. 1]; see also [Doc. 17].

## III. STATEMENT OF FACTS

### A.    Claimant's History

Claimant was born on November 19, 1954, and he was 54 years old at the time

of the ALJ's decision.  (Tr. at 15, 22, 90).  Claimant has a high school education and

completed one year of college, and he has past relevant work experience as a data

---

[2] The complaint filed by claimant in this case, see [Doc. 1], is actually his brief in support of remand, and he chose to solely rely on the arguments advanced in that pleading, see [Docs. 15 & 16], and did not file any other pleadings relevant to this Court's determination.  Thereafter, the Commissioner filed its brief in support of the ALJ's determination.  See [Doc. 17].

center operator, computer technical consultant, a software support specialist, and a technical support analyst. (Tr. at 21-22, 39, 105-07, 123-35).

**B.** **Medical Evidence**[3]

Claimant's medical history shows that he suffered five heart attacks between June of 1987 and the summer of 1995, and that he primarily sought treatment thereafter for coronary artery disease and neck and back pain that occurred as a result of a series of injuries in July of 1999, while he was moving furniture; in May of 2004, when he was moving computer equipment; and in October of 2004, after he was in a motor vehicle accident. See generally [Doc. 6]; see also (Tr. at 302, 308-09, 400, 550, 792-93, 1081).

From January of 1997 through May of 2003, claimant sought treatment from Thomas M. Jordan, M.D. ("Dr. Jordan"), with Cardiovascular Physicians of North Atlanta, P.C. (Tr. at 201-20, 225-27, 233-73, 275-79, 281-307, 389-99, 580-84, 644, 683-87, 701). On January 6, 1997, claimant saw Dr. Jordan for his complaints of chest discomfort and shortness of breath. (Tr. at 302-05). At this time, claimant reported that he experienced chest discomfort occasionally, but that it was always relieved with sublingual nitroglycerin. (Tr. at 302). An electrocardiogram revealed normal

---

[3] The full details of claimant's medical history are unnecessary for the Court's review of this matter, and the following summary of the medical evidence is sufficient for the Court's analysis.

4

sinus rhythm with a rate of 50, left anterior hemiblock, and an old extensive anterior myocardial infarction, and an echocardiogram showed "apical akinesis with other wall motion appearing normal," a "mild mitral regurgitation," and an "[o]verall ejection fraction" of approximately 40 percent. (Tr. at 304, 306-07). Dr. Jordan's assessment at this time was coronary artery disease, hypercholesterolemia, tobacco use, and hypertension, and he adjusted claimant's medicinal regimen, advised him to quit smoking, and scheduled him to undergo a stress test, which he did on January 17, 1997. (Tr. at 201, 304). Specifically, the stress test revealed extensive anterior apical scar with minimal ischemia in the anterior septal region toward the base, inferior scar with minimal peri infarct ischemia, and an enlarged left ventricle, findings which were compatible with an ischemic cardiomyopathy. (Tr. at 201).

Claimant returned for follow up appointments with Dr. Jordan on February 17, May 27, August 13, October 13, and December 8, 1997, during which he continued to complain of occasional chest discomfort and shortness of breath, prompting Dr. Jordan to adjust his medicinal regimen. (Tr. at 292-301). Claimant returned for a follow-up appointment with Dr. Jordan on March 24, 1998, at which time he reported that he was doing fairly well, despite the fact that he had traveled recently and the air pollution caused him to experience some wheezing. (Tr. at 290-91). He reported that he still experienced occasional chest discomfort, which was

still relieved by sublingual nitroglycerin. (Tr. at 290). At this time, Dr. Jordan noted that claimant's coronary artery disease was stable, and he adjusted claimant's medicinal regimen. (Tr. at 291). During his follow-up appointment with Dr. Jordan on April 14, 1998, claimant complained of fatigue, diarrhea, shortness of breath, and diaphoresis. (Tr. at 288). An echocardiogram from that date showed "normal chamber dimensions of the right and left heart, normal left ventricular wall thickness, wall motion abnormalities . . ., and mild left ventricular systolic dysfunction." (Tr. at 287). However, "[n]o significant valvular dysfunction [was] appreciated on this study," and there were no significant changes as compared to the echocardiogram performed on January 6, 1997. (Id.). Dr. Jordan continued claimant on his current medicinal regimen. (Tr. at 289).

On April 20, 1998, claimant underwent another stress test at which time the impression was an enlarged left ventricle, anteroapical scar, posterior scar with minimal peri infarct ischemia, anteroapical hypokinesis with a calculated ejection fraction of 35 percent, and no significant change from the stress test performed on January 17, 1997. (Tr. at 286, 393). The following day, claimant saw Dr. Jordan for his follow-up appointment at which time they discussed the results of the stress test and claimant's complaints of diarrhea and shortness of breath. (Tr. at 284-85). Dr. Jordan adjusted claimant's medicinal regimen and advised him that if he continued

to have further symptoms, he would consider an evaluation by an infectious disease specialist as his ischemic cardiomyopathy was stable. (Tr. at 285). However, on May 19, 1998, claimant saw Dr. Jordan and continued to complain of shortness of breath. (Tr. at 282). Claimant reported that he had been evaluated for his rectal bleeding and there was no evidence of infectious hepatitis. (Id.). Dr. Jordan continued claimant's current medicinal regimen and discussed performing diagnostic right and left heart catheterization in order to determine why he was suffering from shortness of breath and occasional chest discomfort. (Tr. at 283).

On May 20, 1998, Dr. Jordan wrote a letter addressed "To Whom It May Concern," in which he stated:

> [Claimant] is currently being followed by me for multiple medical problems including; an ischemic cardiomyopathy, coronary artery disease, hyperlipidemia, reactive airway disease, and hypertensive heart disease. [Claimant] has recently become more symptomatic and we are currently in the process of further evaluating [his] cardiac function.
>
> At [claimant's] current functional status, his work should be limited to 8 to 10 hours with a 40 hour work week as a norm. As with all cardiovascular patient's, [claimant] should eat at regular intervals and be able to have regular rest periods. In addition, he should avoid sustained lifting of greater than 50 pounds. While [claimant] has [] potentially multiple disabling conditions, he can still perform effectively within an appropriate work environment. Disability assignment cannot be determined by me and if this is needed an evaluation by an industrial medicine physician may be helpful.

(Tr. at 281). Thereafter, on June 2, 1998, claimant underwent a left and right heart catheterization, which revealed severe left ventricular dysfunction, normal pulmonary arterial pressures, decreased aortic arterial saturation, severe mid left anterior descending stenosis, and mild coronary artery disease of the circumflex and right coronary arteries. (Tr. at 277-78). A routine chest x-ray was also performed on claimant which showed cardiomegaly, but no acute process. (Tr. at 275, 279). Claimant next appeared for a follow-up appointment with Dr. Jordan on July 21, 1998, at which time he explained that he had been under a lot of stress and that he had been suffering from headaches. (Tr. at 272-73). Dr. Jordan adjusted claimant's medicinal regimen and instructed claimant to return in two to three months, (Tr. at 273), which he did on October 20, 1998, and reported "doing about the same," (Tr. at 270-71).

Claimant saw Dr. Jordan for follow up appointments on January 12, 1999, and May 11, 1999. (Tr. at 263, 268). During these appointments, it was noted that claimant was "doing about the same," see (Tr. at 263-64, 268-69),[4] and that he had undergone another stress test on April 22, 1999, which showed no significant change from April 20, 1998, see (Tr. at 265). Claimant's next appointment with Dr. Jordan was March 10, 2000, at which time he reported chest discomfort and fatigue. (Tr. at

_____

[4] It was also noted that claimant was still smoking and that Dr. Jordan discussed with claimant his need to quit smoking. (Tr. at 264, 269).

8

262).  Claimant was continued on his medicinal regimen, (id.), and on March 20, 2000, he underwent another stress test, which showed anteroapical scar without ischemia and anteroapical hypokinesis with an ejection fraction of 32 percent, (Tr. at 261).

On March 25, 2000, claimant returned for a follow-up appointment with Dr. Jordan at which time it was noted that his chest pain had improved, but that he was off from work and being treated for a herniated disc.  (Tr. at 256-57).  Dr. Jordan again explained the continued risks of claimant's tobacco use and continued him on his current medicinal regimen.  (Tr. at 257).  On March 27, 2000, claimant returned to see Dr. Jordan at which time he still complained of chest discomfort and fatigue, which he stated was making it difficult to perform his activities of daily living.  (Tr. at 258).  Dr. Jordan's assessment at this time was ischemic cardiomyopathy which was stable, possible small vessel disease and/or spasm, Type II hyperlipidemia, tobacco use, peripheral vascular disease, and significant life stressors, and he adjusted claimant's medicinal regimen but noted that if the symptoms persisted, he was not sure what he could offer him, except that a psychiatric evaluation may be beneficial to help him deal with his life stressors.  (Tr. at 259).

On May 2, 2000, claimant saw William B. Haynes, M.D. ("Dr. Haynes"), with the Hughston Clinic, for evaluation of his low back pain.  (Tr. at 561-63, 565-67).

During this appointment, claimant relayed that he was experiencing significant pain in the small of his back to the right of the midline. (Tr. at 563, 565). Claimant explained that he originally injured his back sometime in 1999 while moving furniture from his dad's house after he had passed away and that he had seen a chiropractor since then on a routine basis. (Id.).[5] Claimant described the pain as in the right S1 joint and buttock area, which radiated down to various levels of the right lower extremity. (Id.).

Upon physical examination, Dr. Haynes observed that claimant was in acute distress, that he ambulated with a slightly flexed gait at the trunk, and that he had a negative straight leg raise bilaterally, but that lifting either leg caused pain in the low back to the right of the midline. (Tr. at 562, 566). Dr. Haynes also observed that claimant had pain to palpation in the right dimple, but that he had no pain in the midline, the right or left paraspinal muscle area, or with range of motion of the hips. (Id.). X-rays of claimant's lumbar sacral spine were negative for acute pathology, but did show some disk space narrowing at L5-S1. (Tr. at 547, 562, 566). Dr. Haynes' impression was lumbar pain syndrome, and he ordered an MRI to confirm

_____

[5] Claimant's medical records show that he received chiropractic treatment on at least 17 occasions between October of 1999 and November of 1999. (Tr. at 551-55).

his assessment, which was performed on May 10, 2000.[6] (Tr. at 521, 541, 561-62, 566-68, 637, 698). The MRI showed a "small central disk herniation in apposition to the anterior border of the S1 nerve roots, slightly more towards the right then the left" at the L5-S1 region, with the remaining disk spaces appearing normal. (Tr. at 521, 541, 568, 637, 698). Osteoporotic change was noted in the vertebral bodies, but otherwise, it was an "unremarkable MR scan of the lumbar spine." (Id.).

Claimant returned to Dr. Haynes following the results of his MRI on May 15, 2000, at which time he presented with complaints of pain down his right lower extremity to the knee and sometimes all the way down to the ankle with occasional numbness in his left thigh area to the knee. (Tr. at 569). Dr. Haynes discussed claimant's options, which included steroids, epidurals, or surgery, and referred him to E. Scott Middlebrooks, M.D. ("Dr. Middlebrooks"), a spine specialist. (Id.). On May 17, 2000, claimant saw Dr. Middlebrooks for an initial consultation regarding his back and leg symptoms and, based on Dr. Middlebrooks' physical examination,

---

[6] On May 9, 2000, Dr. Haynes completed a Certification of Disability for claimant's employer in which he noted that claimant was currently unable to perform his duties and that his return-to-work date would be determined after the results of the MRI. (Tr. at 574).

he opined that claimant should undergo a lumbar epidural steroid injection. (Tr. at 570-71).[7]

On June 28, 2000, claimant saw Reuben Sloan, M.D. ("Dr. Sloan"), with Resurgens Orthopaedics, at which time claimant reported that he felt physical therapy was helping, that his back pain was beginning to centralize, and that he felt improvement with his pain level, which he rated a three to four on a scale of one to ten. (Tr. at 544).[8] Dr. Sloan's impression was that claimant's S1 radiculitis was improving following his epidural steroid injection and physical therapy, and claimant was instructed to continue his pool physical therapy for two weeks at which time he was to return to Dr. Sloan to be reassessed. (Id.).

Claimant returned to Dr. Sloan for a follow-up appointment on July 12, 2000, at which time he reported that he had suffered a flare up of his right-sided complaints with his pain level increasing to a five on a scale of one to ten. (Tr. at 542-43). Claimant reported that he was having a difficult time getting around, indicating that he could not walk within the supermarket without experiencing pain. (Tr. at 542). Physical examination revealed a very slow gait, but he was able to heel

---

[7] On May 25, 2000, Dr. Middlebrooks completed a form for claimant's employer in which he noted that claimant's estimated return-to-work date was July 5, 2000. (Tr. at 573).

[8] While it is clear that this appointment was a follow-up appointment, see (Tr. at 544), this is the first legible treatment note with Dr. Sloan that appears in the eCAR.

and toe walk.  (Id.).  At this time, Dr. Sloan believed it was best to pursue surgical consultation given claimant's significant functional limitations.  (Tr. at 542-43).[9]

During claimant's follow up appointment with Dr. Jordan on July 13, 2000, he reported that his back was doing better after his epidural and that his lifestyle had improved in that he was smoking less, eating better, and felt less tension, though he still had some chest discomfort.  (Tr. at 254, 584, 687).  Claimant was continued on his medicinal regimen and was advised that he would need to be closely monitored should he undergo any type of orthopaedic surgery due to possible heart failure. (Tr. at 255, 583, 686).

On July 21, 2000, claimant was seen for evaluation of his low back pain by Hartley L. Falbaum, M.D. ("Dr. Falbaum"), with Resurgens Orthopaedics, based on the surgical referral from Dr. Sloan.  (Tr. at 633-34, 694-95).  Dr. Falbaum's impression after performing a physical examination of claimant was that claimant's symptoms were improving and that continued physical therapy and conservative treatment were warranted.  (Tr. at 633, 694).  Dr. Falbaum noted that claimant did have signs of a mild S1 radiculopathy with the absent ankle jerk reflex and the

---

[9] During this appointment, Dr. Sloan also completed a form for claimant's employer indicating that while claimant was not totally disabled, he was restricted from prolonged sitting of greater than 30 minutes and no bending, stooping, kneeling, or squatting, but that he expected these restrictions to be lifted in September of 2000.  (Tr. at 557).

mildly positive straight-leg raising, but stated that over 80 percent of all ruptured discs heal with conservative treatment within 18 to 24 months. (Id.).[10]

On October 11, 2000, claimant returned for a follow-up appointment with Dr. Jordan, at which time he reported that he was doing fairly well from a cardiac standpoint, but that he was still unable to work due to his back issues for which he had been taking pain and inflammatory medications and receiving physical therapy twice a week. (Tr. at 252, 582, 685). Claimant reported that he had no apparent side effects from his current medications, and he was continued on his current doses with instructions to follow up in three to four months, or sooner, if needed. (Tr. at 252-53, 581-82, 684-85).[11] An ultrasound of the abdominal aorta on December 27, 2000, showed "intimal thickening with calcification but no enlargement." (Tr. at 251).

_____

[10] Claimant was referred to Physiotherapy Associates for physical therapy for his low back pain on this date; however, records from this visit and concurrent treatment notes are largely illegible. See (Tr. at 519, 521-30). On August 11, 2000, Dr. Falbaum also completed a return-to-work form for Hewlett-Packard in which he found claimant could work four hours per day for five days per week, but should avoid all lifting, climbing, repetitive kneeling, repetitive squatting, repetitive overhead work, and pushing or pulling. (Tr. at 515-17, 536-40). However, Dr. Falbaum did not believe that these limitations were permanent. (Tr. at 517, 538). On August 18, 2000, claimant followed up with Dr. Falbaum and reported that he was doing better. (Tr. at 636, 697).

[11] On November 15, 2000, Robert T. Greenfield, III, M.D., with Resurgens Orthopaedics, completed a Medical Release to Return to Work form in which he noted that claimant could return to work without any work hour restrictions. (Tr. at 509).

During claimant's follow up appointments with Dr. Jordan on February 15, June 28, and November 1, 2001, he reported that he was doing well, that he was working from home and felt that it had relieved one of his life stressors, that he has had no problems with lower extremity edema except on occasion when he has stood for too long, that his shortness of breath and chest discomfort had improved, and that he did not have any problems associated with his medications.[12] (Tr. at 245-50). On May 23, 2002, claimant returned for a follow-up appointment with Dr. Jordan at which time he reported that he was doing about the same, that he occasionally had chest discomfort when he got upset, that he occasionally had lower extremity edema when he stood on his feet for a prolonged amount of time, but that he had no problems with muscle aches or his medications.  (Tr. at 243).

Claimant followed up with Dr. Jordan on October 31, 2002, at which time he had just returned from his annual trip to Arizona and relayed that he "enjoyed the local cuisine and beverage in great quantity."  (Tr. at 235).  His lipid profile during this appointment was "far from optimal," and he reported that he continued to smoke one pack per day of tobacco.  (Id.).  Dr. Jordan discussed claimant's "high-risk profile and his apparent cavalier attitude towards making therapeutic lifestyle changes," to which claimant explained that "he [was] more concerned about the

_____

[12] An electrocardiogram ("EKG") from November 1, 2001, revealed no change from his prior EKG on March 10, 2000.  (Tr. at 246).

quality of his life as opposed to his longevity" and that he knowingly engages "in the dietary and smoking indiscretions because of this." (Tr. at 236).[13]

On January 9, 2003, claimant saw Joel L. Fine, M.D. ("Dr. Fine"), with Fine & Associates, Internal Medicine Specialists, P.C., for an initial consultation for his COPD based on a referral from Dr. Jordan. (Tr. at 384-86). Dr. Fine noted that claimant appeared "post MI x 5 with left ventricular aneurysm, however, [he] continues to smoke and drink approximately 16 ounces of alcohol per week." (Tr. at 386). He noted that claimant had a "cavalier attitude towards preventative healthcare" and that he stated, "I would rather live happy than long." (Id.). Claimant denied having any chest pains, shortness of breath, abdominal pain, or any focal neurologic deficits. (Id.). Dr. Fine's assessment at this time was arteriosclerotic cardiovascular disease, hypertension, elevated cholesterol with claimant's lack of desire to consider a low-fat diet, COPD exacerbated by claimant's tobacco abuse, gastroesophageal reflux disease, and tobacco abuse. (Tr. at 385). Claimant followed up with Dr. Fine on April 10, 2003, at which time he noted that claimant's

_____

[13] An echocardiogram from November 7, 2002, revealed "normal chamber dimensions of the right and left heart, wall motion abnormalities . . ., with overall lower limits of normal left ventricular systolic function with an estimated ejection fraction of approximately 50%." (Tr. at 233, 389, 644, 701). There was no "significant valvular dysfunction" and the findings were consistent with ischemic heart disease. (Id.). In addition, an x-ray of claimant's chest revealed mild cardiomegaly with no acute changes. (Tr. at 234).

hypertension was well controlled, his COPD was essentially asymptomatic, that he refused to consider a low-fat diet to help with his hyperlipidemia, that he had acne rosacea but was not receptive to suggested treatment, and tobacco abuse. (Tr. at 378).

On May 1, 2003, claimant presented to Dr. Jordan for a follow-up appointment at which time he complained of problems with allergies, sinuses, and fatigue. (Tr. at 225-26). He denied experiencing any lower extremity edema or muscle aches, but relayed that he was completely lacking energy, which he felt may be caused in part by his working the night shift. (Tr. at 225). An echocardiogram from this date showed "normal chamber dimensions of the left and right heart, normal [left ventricular] wall thickness, wall motion abnormalities . . . with overall grossly normal [left ventricular] systolic function[, and] . . . trace mitral regurgitation [] with normal valvular appearance." (Tr. at 227). In sum, the findings were "stable compared to [the] prior echocardiogram." (Id.). Claimant's medicinal regimen was adjusted and he was instructed to return in six months. (Tr. at 226).

On June 4, 2003, claimant saw Dr. Fine for a refill of some of his medications, and Dr. Fine noted that claimant's coronary artery disease was well compensated, that claimant had finally agreed to treatment for his rosacea, and that he had anxiety with a unique personality component. (Tr. at 374). In short, Dr. Fine concluded that

claimant was "overall on a self destructive pattern with smoking and fatty meals and history of depression," and he did not feel that claimant was "willing to change any of [those] self destructive patterns." (Id.). Claimant followed up with Dr. Fine on October 16, 2003, at which time he "admitted to numerous indiscretions, particularly Jack Daniels bourbon." (Tr. at 368-69). Claimant reported being stressed and when asked whether there were any improvements he could make, he responded, "well I could load my 9 mm," but he clarified that he was not homicidal or suicidal. (Tr. at 369). Claimant also reiterated that he was not "interested in changing any of his habits," that he had "discussed this on many occasions . . . that frankly [he was] not going to change a thing until [he was] dead," and that he would "stop smoking about three and a half hours after they cremate [him]." (Id.). At this time, Dr. Fine referred claimant for further evaluation of his chest pain, despite the fact that it was noted that his chest pain did not sound cardiac in nature, but was more likely due to stress; prescribed Prozac for fatigue and stress; and continued him on his medicinal regimen for his hypertension, which was noted as well controlled, and his congestive heart failure, which appeared well compensated and without evidence of volume overload. (Tr. at 368).[14]

---

[14] On October 16, 2003, Dr. Fine also completed an affidavit for claimant to obtain a disabled person's license plate in which he marked that claimant was "so ambulatorily disabled that he . . . [could not] walk 200 feet without stopping to rest." (Tr. at 373).

On November 14, 2003, claimant saw James E. Barnhill, III, M.D. ("Dr. Barnhill"), with Gwinnett Consultants in Cardiology, P.C., for an initial consultation for ischemic cardiomyopathy based on a referral from Dr. Fine. (Tr. at 358-59). During this initial exam, Dr. Barnhill noted that claimant suffered from intermittent episodes of exertional dyspnea and chest tightness, but that it was mostly due to the emotional stress of his job in the software service field with Hewlett Packard. (Tr. at 358). He also noted that the frequency of claimant's stress-induced chest discomfort was only about once a month and that it was usually relieved by rest and sometimes one to two "Nitros." (Id.). Dr. Barnhill further noted that a review of claimant's medical records revealed a fixed anterior defect without any evidence of peri-infarct ischemia. (Id.). After reviewing claimant's medical records and conducting a physical examination of claimant, Dr. Barnhill concluded that claimant had a fixed anterior defect, an ejection fraction that varied between 35 and normal at 50 to 55 percent, that he had "stable exertional angina," and no clinical congestive heart failure at the time. (Tr. at 358-59). Dr. Barnhill adjusted claimant's medicinal regimen and ordered further testing with instructions for claimant to follow up within the next few weeks for further recommendations. (Tr. at 359).

On December 17, 2003, Allan Freedman, M.D. ("Dr. Freedman"), with Suburban Hematology-Oncology Associates, P.C., evaluated claimant for his

leukocytosis based on a referral from Dr. Fine. (Tr. at 356). Dr. Freedman noted that the medical records he had reviewed indicated that claimant's leukocytosis had been documented as far back as November of 1996, and that claimant reported that he had suffered from chronic bronchitis, was a former alcoholic, and that he had been taking steroids intermittently. (Id.). Dr. Freedman's physical examination of claimant revealed "some ronchi in his lungs, but no hepatosplenomegaly" as well as a "slight increase in the number of white cells, but these were mature polymorphonuclear leukocytes, with no immature forms." (Id.). Dr. Freedman further noted that claimant's "platelets were normal in number and appeared to be of normal morphology," and that his "red cells were remarkable for mild anisocytosis, but no poikilocytosis." (Id.). Based on his examination, Dr. Freedman concluded that claimant had a "longstanding, mild leukocytosis which [he] believe[d] [was] a reactive process and [did] not represent[] an underlying primary hematologic condition such as a myeloproliferative disorder." (Id.). Therefore, Dr. Freedman did not feel that any specific hematologic workup was needed. (Id.).

On December 19, 2003, claimant underwent an echocardiogram, which revealed that he had a "[m]oderately reduced left ventricular systolic function due to inferoapical and anteroapical wall old infarction" with an "[e]jection fraction [of] 35% to 40%." (Tr. at 355). Additionally, "[t]race mitral and trace tricuspid

20

regurgitation with normal–appearing pulmonary artery pressures" were noted. (Id.). Thereafter, on January 8, 2004, claimant returned to Dr. Barnhill's office for a follow-up appointment, at which time Dr. Barnhill explained that claimant's numerous stress examinations revealed that there was no evidence for ischemia. (Tr. at 351). Dr. Barnhill's impression at this time was "[i]schemic cardiomyopathy with ejection fraction 35% to 40% by recent echocardiography and dual isotope testing with no evidence for myocardial ischemia and simply an apical scar," that claimant was "[c]linically doing well," and that he had mild bronchospastic disease. (Id.). Dr. Barnhill ordered a chest x-ray and instructed claimant to follow up in about three months. (Id.).

On January 15, 2004, claimant saw Dr. Fine for a follow-up evaluation at which time he reported that he was doing well overall, but he returned on March 30, 2004, with complaints of facial pressure and it was noted that he had allergic conjunctivitis. (Tr. at 343, 348). During his March 30 appointment, claimant also reported that he continued to drink heavily and he therefore declined antibiotics at that time. (Tr. at 343). Claimant returned to Dr. Fine's office on June 2, 2004, with right parasacral and paralumbar discomfort that he had been experiencing the last few days, which he reported may have been related to moving computer equipment. (Tr. at 333). Dr. Fine's assessment at this time was right sciatica with L5

radiculopathy and right parasacral muscle spasm, and he referred claimant to physical therapy and provided him with a limited duty note for work in that claimant was limited to 5 hours in half-day shifts with light duty; no prolonged sitting, standing, or stooping; and no lifting any objects over 15 pounds for the next 2 weeks.  (Tr. at 333-34).[15]

On June 7, 2004, Dr. Barnhill completed a Medical Restrictions form for Hewlett Packard in which he noted that claimant needed a stretch break from sitting every 60 minutes; that he had no restrictions for standing or walking; that he was limited from engaging in bending, stooping, and squatting but that he had no restrictions for climbing, reaching above his shoulders, or kneeling; that he should not lift any objects greater than 25 pounds; that he should not push; that he had no restrictions for simple grasping; and that he did not need to avoid any exposure or the operation of powered vehicles.  (Tr. at 778-79).  Dr. Barnhill also opined that any work restrictions noted were not permanent.  (Tr. at 779).

---

[15] Claimant's medical records show that he received physical therapy treatments primarily for his low back pain at Physiotherapy Associates on at least 17 occasions from June of 2004 through August of 2004.  (Tr. at 443-48, 597-609, 615-21, 624-25, 642-43, 647-48, 678-79, 703-04, 712-13, 715-16, 718-19, 721-22, 727-28, 750-56, 760-63, 765-66, 770-71, 775).  Treatment notes from these sessions indicate that despite showing some improvement with pain during certain visits, claimant continued to complain of soreness and radicular pain. See (Tr. at 444-45, 447, 597, 604, 606, 608, 615, 617, 619, 642, 647, 678, 703, 712, 715, 718, 750, 760, 762, 765, 771).

Claimant was referred to Arnold J. Weil, M.D. ("Dr. Weil"), with Non-Surgical Orthopaedics, P.C., for evaluation of his low back pain, and he presented to Dr. Weil on June 7, 2004, explaining that he had injured his back sometime in 1999 while moving furniture and then re-injured it this past May while carrying his computer from home into his office, and that he had been treated conservatively since 1999. (Tr. at 419-21, 424-27, 589-91, 626-29, 730-33, 735-38). Claimant described the pain as radiating into his right leg down to his knee with associated numbness and tingling into his legs, bilaterally. (Tr. at 424). He reported that his symptoms were exacerbated by sitting, standing, and walking. (Id.). Claimant's gait was mildly antalgic, his cervical range of motion was normal in all directions, and he had a normal range of motion in his thoracic region, but his lumbar range of motion was diminished to flexion with diffuse tenderness in the lower lumbar spine and paraspinal muscle spasm. (Tr. at 425-26). It was also noted that claimant had a decreased ankle reflex on his right side. (Tr. at 427). An x-ray of claimant's lumbar spine showed "mild facet arthropathy in the lower lumbar segments," normal disc spaces, and aortic calcification. (Id.). Dr. Weil's assessment was chronic low back pain with a history of L5-S1 disc herniation and an acute injury with overlying muscle spasm and right sciatica. (Id.). He prescribed claimant medications to manage the pain and administered electrostimulation for 15 to 30 minutes as well

as prescribed a unit for home use. (Tr. at 427, 505). Dr. Weil also restricted claimant from lifting over 15 pounds or engaging in any repetitive bending or twisting. (Tr. at 427).

On June 17, 2004, claimant saw Dr. Weil for a follow-up appointment during which he reported that he had continued to work light duty and that he was still experiencing severe low back pain and pain radiating into his right leg. (Tr. at 418, 772, 777). At this time, Dr. Weil recommended that claimant undergo physical therapy for spine stabilization, myofascial modalities, and strengthening, and he adjusted claimant's medicinal regimen. (Id.). Claimant remained on the same work restrictions. (Id.). Claimant returned on June 23, 2004, at which time he advised Dr. Weil that he had not started physical therapy yet, and that he still continued to have back and right leg pain and "significant discomfort especially with sitting for long periods of time." (Tr. at 417, 773). Claimant's lumbar range of motion was significantly decreased, but the remainder of the physical examination was unchanged from the last visit.

On July 8, 2004, claimant again saw Dr. Weil, and he reported that he had been attending physical therapy, which he thought was helping, but that he was experiencing new pain in his right buttock, radiating into the right groin area. (Tr. at 415, 640, 767). Dr. Weil noted that claimant's lumbar range of motion was still

decreased, but that it had improved. (Id.). His assessment of claimant was lumbar pain, lumbar myofascial pain, history of herniated disc, and S1 joint pain, and he continued claimant's physical therapy sessions and medicinal regimen and instructed him to follow up in two weeks. (Id.).[16]

Claimant returned for treatment with Dr. Weil on July 22, 2004, and reported that he was still having pain in the buttocks area, right greater than left, but that he was not having any leg pain, though his back pain was about the same. (Tr. at 413-14, 595-96, 622-23, 724-25, 743-44). Claimant also reported that he was still working, but that sitting for a long period of time aggravated his pain. (Tr. at 413). Dr. Weil continued claimant's course of physical therapy and recommended that he be administered a steroid injection. (Id.). Dr. Weil also reiterated claimant's work restrictions in that he should not lift over 25 pounds; engage in any pushing or pulling, repetitive bending, twisting, stooping, or crawling; that he should limit his squatting and sitting; and that he should stretch every 60 minutes. (Tr. at 414).

On August 4, 2004, claimant underwent an MRI of his lumbar spine, see (Tr. at 312, 592, 612, 667, 708, 740), and on August 6, 2004, claimant returned to Dr. Weil for a follow-up appointment at which time Dr. Weil reviewed claimant's MRI results

---

[16] On July 15, 2004, claimant saw Dr. Fine for a follow-up evaluation at which time his hypertension and gastroesophageal reflux disease appeared well controlled and he was again encouraged to quit smoking. (Tr. at 329-30).

with him, (Tr. at 411-12, 429-30, 593-94, 741-42).  In particular, Dr. Weil noted that the MRI of claimant's lumbar spine showed "left paracentral disc protrusion at L5-S1 causing mild crowding over the left lateral recess and extend[ing] into the neuro foramina" and a "disc bulge at L4-5."  (Tr. at 411); see also (Tr. at 312).  Claimant's lumbar range of motion was limited, and it was noted that physical therapy seemed to be aggravating the pain more than helping.  (Tr. at 411).  Dr. Weil scheduled claimant for two lumbar epidural steroid injections, which were administered on August 11 and August 18, 2004.  (Tr. at 411, 431-32, 435-36, 440-41, 466-67, 496-99, 668-69, 674-75).

On August 25, 2004, claimant reported to Dr. Weil that despite complications with his first injection, he had good pain relief and was pain free for several days but that the pain eventually came back, though it was still less than it was prior to the injection.  (Tr. at 409-10, 610, 613-14, 649, 672-73, 705-06, 709-10).  However, claimant reported that the pain was worse after the second injection, but that he was not having any leg pain, numbness, or tingling.  (Id.).  He relayed that he had been "drinking quite a bit of vodka in order to relieve his pain." (Id.).  Dr. Weil scheduled claimant for a third lumbar epidural steroid injection, which was administered on September 1, 2004.  (Tr. at 410, 482-83, 501-02, 676-77).  Thereafter, on September 8, 2004, claimant reported to Dr. Weil that he was getting temporary relief from his

pain due to the injections, and Dr. Weil scheduled claimant for a Functional Capacity Evaluation ("FCE"). (Tr. at 407, 646, 665, 702).

On September 23, 2004, claimant underwent an FCE, administered by physical therapist Judy Shankman, PT ("Shankman"). (Tr. at 652-61). During the evaluation, claimant reported low back pain with occasional pain down his right leg and occasional numbness in both legs. (Tr. at 654). He reported that sitting or standing for longer than 1 hour, or walking for more than 30 minutes, aggravated his symptoms. (Id.). Shankman noted that claimant was able to sit for 45 minutes and stand for 30 minutes during the evaluation, and that he was restricted with regard to carrying and stooping. (Tr. at 661). She also noted that claimant's occupation as a response center engineer for Hewlett Packard required performance at the light exertional level, which she concluded claimant could perform. (Tr. at 652-53). Based on her evaluation, Shankman reported:

> The results of this FCE indicate that [claimant] should be able to perform the essential tasks of his current job with the restrictions of not lifting more than 20 pounds. This is reportedly necessary only about once a year when he has to take his PC for upgrades. In the future, he would not be able to lift his own PC safely. I would also recommend that [claimant] continue to limit his sitting time to no more than an hour at a time. Due to evidence of symptom magnification, further psychological evaluation may be indicated. [Claimant] put forth consistent, maximal effort on all of the tests, with the exception of the lumbar range of motion testing. He demonstrated greater range of motion into lumbar extension while doing a prone press up than he

performed in standing. Also, he was inconsistent in his effort with standing lumbar flexion.

(Tr. at 652).

Following the FCE, claimant returned to Dr. Weil on September 29, 2004, at which time Dr. Weil explained to him that the FCE indicated that he could "perform the essential tasks of his current job with the restrictions of not lifting more than 20 pounds." (Tr. at 405-06, 433-34, 575-76, 650-51). Dr. Weil opined that claimant had reached maximum medical improvement, concluding that he had a "[p]artial impairment rating [] equal to 5% for his lumbar spine with permanent restrictions of no lifting over 20 pounds per recommendations of his FCE." (Id.). Dr. Weil also noted that claimant "must be able to alternate between sitting and standing" and that he should not sit for more than one hour without being able to get up and stand for about ten minutes. (Tr. at 406).

On October 31, 2004, claimant was taken by ambulance to the emergency room at Gwinnett Hospital with complaints of neck and back pain following a motor vehicle accident. (Tr. at 785-87). Claimant was initially ambulatory following the accident and went home, but then suffered an onset of a headache and neck and back pain along with ringing in his ears. (Tr. at 785). Claimant complained of posterior neck and back pain, but denied any extremity complaints. (Tr. at 786). Physical examination of claimant's neck revealed some mild upper and lower

paracervical tenderness, but no crepitus or deformity, and his back showed slight bilateral upper and lower parathoracic and paralumbar tenderness with spasm, but no evidence of thoracic or lumbar spinal crepitus or deformity. (Id.). Claimant had full range of motion in all of his extremities with no tenderness or trauma noted. (Id.). An x-ray of claimant's cervical spine showed fused C3-C4, but no other obvious subluxation or fracture, and x-rays of his thoracic and lumbar spines did not reveal any significant abnormalities. (Id.). Claimant was administered pain medications, which helped his symptoms significantly, given a work excuse for two days, and released. (Tr. at 786-87).

On November 23, 2004, claimant saw Raymond Stovall, M.D. ("Dr. Stovall"), as a new patient after being referred by Dr. Fine's office due to personality conflicts claimant had with Dr. Fine's physician's assistant. (Tr. at 817, 819). Dr. Stovall noted that claimant did not have any particular complaints, but just needed a follow-up evaluation and refills of his medications. (Tr. at 819). Dr. Stovall also noted that claimant's primary issue was coronary artery disease, but that he had injured his back, though claimant reported having a good response to physical therapy for that issue. (Id.). After conducting a physical examination of claimant, Dr. Stovall's assessment of claimant was that he had hypertension that was well controlled; asymptomatic coronary artery disease; a herniated lumbar disk and

cervical strain with good symptomatic relief after epidurals; chronic bronchitis with continued tobacco use that had relatively good symptomatic control on medication; a high-risk lifestyle, including his tobacco and alcohol use; insomnia controlled by medication; and asymptomatic irritable bowel syndrome. (Tr. at 817). Dr. Stovall refilled claimant's medications with instructions to return in four months. (Id.).

On December 27, 2004, claimant appeared at the North Georgia Neurological Clinic, P.C., for an initial neurologic consultation for his tinnitus with Yazan Houssami, M.D. ("Dr. Houssami"). (Tr. at 789-91). Claimant reported that he had been suffering from bilateral tinnitus for the last three months and relayed that it started within five hours of his involvement in the October motor vehicle accident. (Tr. at 789). Claimant reported that the tinnitus fluctuated in severity, with it being louder at night and worse on the left side, and that it was a high-pitched multi-tonal sound. (Id.). Claimant also reported that he had difficulty with his memory, but with concentration, he would later remember what he had forgotten. (Id.).

Upon physical examination, claimant had no evidence of external head trauma and had full range of painless motion of his neck. (Tr. at 790). Claimant's neurological examination revealed normal cognitive functions and normal speech content and structure with no difficulty answering questions on the medical questionnaire or posed by Dr. Houssami. (Id.). Dr. Houssami's impression was that

claimant's tinnitus was a component of post-concussive syndrome of mild severity, and he recommended that claimant undergo a neuropsychological evaluation and receive treatment for post-concussive syndrome. (Tr. at 790-91).[17]

On January 21 and January 28, 2005, claimant saw Rachel Lacy, Psy.D. ("Dr. Lacy"), for "a neuropsychological evaluation to assess his current level of cognitive and emotional functioning in order to determine the nature of his cognitive complaints." (Tr. at 792-804). Dr. Lacy, who received some of claimant's medical records, conducted a clinical interview and mental status examination of claimant. (Tr. at 792). After receiving background information from claimant, including that he was involved in a motor vehicle accident on October 30, 2004; that he had been receiving treatment for headaches, back, cervical, shoulder, and neck pain, and tinnitus; that he had memory problems; and that he suffered from clinical depression, Dr. Lacy questioned claimant regarding his social history. (Tr. at 792-94).

Dr. Lacy observed that claimant appeared on time for the evaluation and that his appearance was casual and he was adequately groomed. (Tr. at 795). Claimant was cooperative; alert; oriented to time, place, person, and situation; had a

---

[17] An echocardiogram dated January 11, 2005, revealed that claimant had apical wall motion abnormality with an ejection fraction of 45 percent and left atrial enlargement, but there was no significant change in comparison to his echocardiogram from December 19, 2003. (Tr. at 818).

constricted affect and anxious mood; had largely intact language functions and motor functioning; had no evidence of hallucinations, delusions, or disorganized thought processes; had grossly intact attention span as well as immediate, recent, and remote memory; had limited insight and judgment; and he put forth and maintained good effort throughout testing. (Id.).

Dr. Lacy administered claimant a series of tests, including the Battery for Health Improvement-2 ("BHI-2"), the Beck Anxiety Inventory, the Beck Depression Inventory-II, the Delis-Kaplan Executive Functions Systems and selected subtests, the Minnesota Multiphasic Personality Inventory-2, the Reitan-Indiana Aphasis Screening, Reitan-Klove Sensory Perceptual Examination, the Rey-Osterreith Complex Figure Test, Visual Acuity (near), the Wechsler Adult Intelligence Scale-III ("WAIS-III"), the Wechsler Memory Scale-III ("WMS-III"), the Wide Range Achievement Test-3 ("WRAT-3"), and the Wisconsin Card Sorting Task. (Tr. at 795). Dr. Lacy reported that claimant's general level of intellectual functioning was in the average range, that his score on the Verbal Comprehension Index was in the high average range, and that his score on the Working Memory Index was in the average range. (Tr. at 796). His general cognitive ability as measured by the WAIS-III placed him in the average range with a verbal scale IQ score of 102, a performance scale IQ score of 98, and a full scale IQ score of 100. (Id.). Claimant's achievement scores as

measured by the WRAT-3 placed him in the high average range for reading and spelling and in the average range for arithmetic, and his attention and executive functioning revealed largely intact attentional skills with some variability on selected measures.  (Tr. at 797).  Claimant was able to perform complex attention tasks well within normal limits, but he performed in the low average range on an auditory attention task, in the average range on a task of a complex auditory attention and sequencing, and in the high average range on a visual attention task. (Id.).

With regard to his memory functioning, claimant "performed overall in the average range on immediate and delayed tasks and in the high average range on recognition."  (Tr. at 798).  Claimant's "overall performance on visual memory measures of the WMS-III was in the high average range on immediate recall and average on delayed recall tasks."  (Id.).  In sum, Dr. Lacy found claimant's "auditory and visual memory skills [were] intact."  (Id.).

During the health and pain assessments, claimant relayed that he continued to suffer from lumbar and cervical spine pain, rating his pain at the time of the assessment as a "3" on a scale of 1 to 10, noting that on average, his pain was around "5-6" but could reach as high as "8."  (Tr. at 800).  Claimant's "response pattern on the BHI-2 indicated unusually low psychological defensiveness and a tendency to

report things in a negative light," which Dr. Lacy thought "may indicate [his] attempt to emphasize his problems so as to impress . . . the severity of his difficulties." (Id.). Dr. Lacy noted that claimant's "level of depression and anxiety, though not unlike many patients with medical problems, was clinically significant." (Id.). However, with regard to his personality and emotional functioning, Dr. Lacy noted that claimant's "responses on a measure of subjective anxiety was within the 'normal' range, while on a measure of subjective depression was in the 'mild' range." (Id.).

In summary, Dr. Lacy noted that claimant "put forth and maintained good effort throughout the evaluation and, therefore, the results [were] valid representations of his current level of neuropsychological functioning." (Tr. at 801). She noted that claimant was functioning in the "average range of intellectual functioning with above average verbal comprehension skills"; that his vocabulary was in the superior range; his visual and auditory memory were in the average to high average range; his working memory, perceptual organization, calculation, problem solving, executive functioning, and verbal fluency were all in the average range; his language functioning, sensory-motor skills, and visual acuity were all within normal limits; and that his visual and verbal attentional skills were largely intact, but that he had low average processing speed. (Tr. at 801-02). Dr. Lacy also

found that "[m]easures of emotional functioning, personality and health concerns revealed that [claimant] ha[d] significant distress regarding his overall health." (Tr. at 802).

Based on her findings, Dr. Lacy concluded that claimant did not have a traumatic brain injury. (Id.). She concluded that claimant's slightly decreased processing speed would be consistent with clinically significant depression and anxiety. (Id.). Based on claimant's reports that the motor vehicle accident reminded him of his loss of loved ones in an unrelated vehicle accident, Dr. Lacy thought that the event "may have been quite traumatic and brought to surface fears of dying and suffering loss," and that claimant met the criteria for PTSD. (Tr. at 802-03). Dr. Lacy's diagnostic impressions were Axis I: PTSD, chronic, and pain disorder associated with both psychological factors and general medical condition; Axis II: dependent personality features; Axis III: tinnitus secondary to mild post-concussive syndrome, cervical and lumbar strain, herniated L5-S1 disk, coronary artery disease, status post myocardial infarction X5, status post left ventricular aneurysm, hypertension, hyperlipidemia, migraine headaches, asthma, irritable bowel syndrome, and diverticulitis; Axis IV: social conflicts and pending litigation; and Axis V: a current Global Assessment Functioning ("GAF") Scale Score of 50.[18] (Tr.

---

[18] "The DSM-IV uses a 'multiaxial system,' which 'facilitates comprehensive and systematic evaluation with attention to the various mental disorders and general

35

at 803).   Dr. Lacy referred claimant for psychotherapy to address his emotional

difficulties associated with both PTSD and pain disorder, and she recommended

that claimant's alcohol intake be further explored and monitored.  (Id.).  Dr. Lacy

also recommended follow-up treatment for claimant's physical problems with his

---

medical conditions, psychosocial and environmental problems, and level of functioning that might be overlooked if the focus were on assessing a single presenting problem.'"  Jackson ex rel. K.J. v. Astrue, 734 F. Supp. 2d 1343, 1348 n.5 (N.D. Ga. 2010), adopted at 1345 (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 27 (4th ed. Text Revision 2000)).  "First, Axis I is for reporting all the various disorders or conditions in the Classification except for the Personality Disorders and Mental Retardation (which are reported on Axis II)."  Id. (citation and internal marks omitted).  "Axis II is for reporting Personality Disorders and Mental Retardation.  It may also be used for noting prominent maladaptive personality features and defense mechanisms."  Id. (citation and internal marks omitted).  "Axis III is for reporting current general medical conditions that are potentially relevant to the understanding or management of the individual's mental disorder," and "Axis IV is for reporting psychosocial and environmental problems that may affect the diagnosis, treatment, and prognosis of mental disorders (Axes I and II)."  Id. (citation and internal marks omitted).  The GAF rating scale, the fifth axis, assesses how well the individual is able to function in his environment and considers psychological, social, and occupational functioning on a continuum ranging from 0-100 according to the severity of the mental illness.  Farrington v. Astrue, No. 3:09-CV-94-J-TEM, 2010 WL 1252684, at *11 n.9 (M.D. Fla. Mar. 29, 2010).  An individual with a score ranging from 0-10 is deemed to be a persistent danger of hurting himself and cannot maintain standard self-care, while an individual with a score from 91-100 is deemed to be happy, healthy, and content.  Riddles v. Astrue, No. 5:09cv388/RS/MD, 2010 WL 5071320, at *4 (N.D. Fla. Nov. 3, 2010), adopted by 2010 WL 5067972, at *1 (N.D. Fla. Dec. 7, 2010).  "A GAF score of 41-50 describes serious symptoms and includes serious impairment in the social, occupational or school functioning."  Farrington, 2010 WL 1252684, at *11 n.9 (citation and internal marks omitted).

current physicians, which she thought would be beneficial in helping him "gain a sense of autonomy." (Id.).

On February 17, 2005, claimant had an MRI of his cervical spine performed, which revealed "partial fusion of the C3 and C4 vertebrae and posterior elements, which appear[ed] to be congenital," a "[b]road herniated nucleus pulposus at C5-6 causing flattening of the cord and spinal stenosis," a "[s]mall central herniated nucleus pulposus at C4-5 with slight deformity of the cord," "[m]ultilevel facet and Luschka joint hypertrophy and neural foraminal encroachment[,] . . . [n]o evidence of cord edema or myelomalacia," and spinal stenosis at the C4-5 and C5-6 levels. (Tr. at 810). On March 23, 2005, claimant saw Dr. Stovall for a follow-up evaluation at which time he reported doing better since he had been administered epidural injections in his neck and back. (Tr. at 814). Claimant also reported that he had reduced his alcohol consumption and tobacco use. (Id.). Dr. Stovall adjusted claimant's medicinal regimen and instructed him to return in six months. (Id.).

Claimant returned to Dr. Barnhill's office for a follow-up appointment on March 29, 2005, at which time it was noted that claimant was fairly active, though his exercise was restricted by his chronic lumbar disc disease for which he was still out on disability. (Tr. at 1046-47). It was noted that claimant continued to smoke tobacco, but that he was otherwise stable with no change in exertion tolerance. (Tr.

at 1046). At this time, claimant's ischemic cardiomyopathy was noted as stable and euvolemic, his hyperlipidemia was responding to triple drug therapy, his tobacco abuse had diminished but was still persistent, and that he had a history of post concussion syndrome that he was going to follow up on. (Id.).[19]

On September 2, 2005, claimant underwent a persantine dual isotope myocardial perfusion scan, which showed no evidence of periinfarct ischemia and no significant changes since 2003. (Tr. at 813, 1049); see also (Tr. at 812). Claimant returned to Dr. Stovall on September 23, 2005, with "no real particular complaints." (Tr. at 812). Dr. Stovall noted that claimant's blood pressure had been well controlled and that he had been asymptomatic from a cardiac standpoint. (Id.). He also noted that claimant reported "doing fairly well with the epidural injections" but that he still had "mild pain," and that he wanted a referral to an ENT for his tinnitus since Dr. Houssami had released him. (Id.). Dr. Stovall encouraged claimant to quit smoking and to modify his alcohol intake and he gave him a referral for his tinnitus. (Id.).

On October 24, 2005, claimant saw Jeffrey Roth, M.D. ("Dr. Roth"), with Northeast Atlanta Ear, Nose & Throat, P.C., for evaluation of his tinnitus. (Tr. at

---

[19] Imaging of claimant's thoracic spine on June 3, 2005, showed "mild deformity of the posterolateral aspect of the cord at the T10-11 level due to facet hypertrophy," but no evidence of any cord edema or myelomalacia. (Tr. at 807).

947).  Dr. Roth noted that claimant complained of a loud ringing in his left ear and decreased hearing.  (Id.).  Physical examination of claimant's ears showed "normal lympanic membranes with normal mobility to pneumatic otoscopy."  (Id.).  Audiogram and tympanograms also confirmed normal hearing with normal pressure in the ears.  (Id.); see also (Tr. at 939-40, 943).  Dr. Roth's impression was "tinnitus in a patient with normal hearing and normal middle ear function" for which conservative treatment was warranted.  (Tr. at 947).[20]

On October 25, 2005, claimant saw Daryl L. Figa, M.D. ("Dr. Figa"), with Atlanta Orthopedics, for evaluation of his cervicothoracic pain.[21]  (Tr. at 1057).  Dr. Figa noted that claimant had undergone a "cervical facet radiofrequency neurotomy on April 19, 2005, and [a] thoracic radiofrequency neurotomy on September 20, 2005."  (Id.); see also (Tr. at 851, 901).  Claimant reported that he had a marked benefit in the cervical region with progressive return of symptoms, but that while the thoracic radiofrequency worked on the right side, he still had continued

---

[20] Claimant reported that he received treatment for his tinnitus sometime between June and July of 2006, see (Tr. at 192); however, the treatment notes from these appointments do not appear in the eCAR.

[21] The Court notes that this is the first treatment record that appears in the eCAR, but that it is clear from claimant's medical records that Dr. Figa began his treatment of claimant earlier than October 25, 2005.  In particular, Dr. Figa administered claimant cervical facet blocks on March 22, 2005, see (Tr. at 823), and bilateral T10-11 thoracic facet blocks on June 21, 2005, see (Tr. at 876).

discomfort on his left side. (Tr. at 1057). Claimant requested that these procedures be repeated, (id.), and they were performed on November 1, 2005, (Tr. at 997-98, 1055-56).

Claimant returned for a follow-up evaluation with Dr. Figa on November 16, 2005, at which time he reported that his symptoms had improved, noting marked improvement with his neck pain but some continued discomfort in the mid-back region. (Tr. at 1054). Dr. Figa noted that x-rays were indicative of L5-S1 degenerative disc disease and spondylosis. (Id.). Claimant relayed that he was not able to "perform sedentary work activities secondary to his continued pain and limited ability to perform upper extremity computer activities and sitting." (Id.). Dr. Figa scheduled claimant for bilateral L5-S1 facet blocks, which were performed on December 20, 2005. (Tr. at 975, 1054).

On December 15, 2005, physical therapist, David Whitman, PT ("Whitman"), completed a Physical Work Performance Evaluation of claimant based on the diagnoses of cervical herniated nucleus pulposus, cervical strain, lumbar strain, and L5-S1 degenerative disc. (Tr. at 166-72, 929-35). Whitman observed that claimant was able to tolerate repetitive use of both hands and feet and noted that the claimant's "abilities actually exceeded most of his job demands, except that his sitting tolerance did not meet his job's requirements." (Tr. at 167, 930). Based on his

evaluation, Whitman opined that claimant was capable of sustaining light level work for eight hours per day and that his prognosis for return to work was very good. (Tr. at 166, 170, 929, 933). Finally, Whitman concluded that claimant "may be able to return to a former job/occupation" if he was provided a "desk that would allow [him] to change positions from a sitting to a standing position as needed to complete job tasks." (Tr. at 170, 933).

On January 2, 2006, Louise Tashjian, M.D. ("Dr. Tashjian"), a disability determination services ("DDS") non-examining medical consultant, completed a physical RFC assessment of claimant. (Tr. at 948-56). Dr. Tashjian's primary diagnosis was degenerative disc disease and her secondary diagnoses were coronary artery disease, hypertension, and bronchitis. (Tr. at 949). Dr. Tashjian opined that claimant could sit, stand, and walk for about six hours in an eight-hour workday. (Tr. at 950). Dr. Tashjian also opined that claimant could lift or carry 20 pounds occasionally, 10 pounds frequently, and was unlimited for pushing or pulling. (Id.).[22] Dr. Tashjian opined that claimant could frequently balance, kneel, and crouch, and could occasionally climb ramps and stairs, stoop, and crawl, but should never climb ladders, ropes, or scaffolds. (Tr. at 951). Dr. Tashjian further concluded

---

[22] In reaching these conclusions, Dr. Tashjian noted that claimant's heart disease was stable and that Dr. Barnhill had noted in March of 2005 that claimant was fairly active, only limited by back pain. (Tr. at 948, 950).

that claimant had manipulative limitations in that he was limited in his ability to reach in all directions, including overhead, but that he had no visual, communicative, or environmental limitations. (Tr. at 952-53). Finally, Dr. Tashjian found claimant to be fully credible, but that his "conditions [did] not preclude work at this RFC." (Tr. at 954).[23]

On January 9, 2006, claimant returned to Dr. Figa for a follow-up evaluation of his low back pain and the effects of the lumbar facet blocks, and claimant reported that he had no pain during the period of local anesthetic block but that it returned after about six days. (Tr. at 1053). Claimant reported that he underwent an FCE which found that he was capable of performing light duty activities, but that he did not feel he was able to perform those duties secondary to pain with prolonged sitting and standing. (Id.). Dr. Figa scheduled claimant for a bilateral lumbar facet medial branch radiofrequency neurotomy of the L4, L5, and S1, which was performed on January 23, 2006. (Tr. at 1021, 1053).

On January 12, 2006, Michael Carter, Ph.D. ("Dr. Carter"), a DDS non-examining psychological consultant, evaluated the claimant using a Psychiatric

---

[23] In reaching these conclusions, Dr. Tashjian noted that Dr. Weil's September 29, 2004, opinion regarding claimant's lifting restrictions was given controlling weight, but that his opinion regarding claimant inability to sit for more than one hour at a time was not supported by the medical evidence and given little importance. (Tr. at 948, 955).

Review Technique ("PRT") form and found that claimant had no medically determinable mental impairment. (Tr. at 959-72). Specifically, Dr. Carter noted that claimant had alleged that he suffered from depression that was being treated with medications, PTSD secondary to a motor vehicle accident, and memory and concentration issues. (Tr. at 971). However, Dr. Carter noted that claimant had written an "extremely lengthy ADL form," which he stated attested to "his ability [regarding] his memory of his medical [history] and his concentration and persistence to complete this [history]." (Id. (emphasis omitted)). Dr. Carter also noted that a form was sent to Dr. Roth regarding his prescription of Xanax, which Dr. Roth explained was for claimant's tinnitus rather than for a mental condition. (Id.). [24] Finally, Dr. Carter noted that while claimant had attended a few sessions of counseling after his motor vehicle accident, he had been discharged on the basis that his doctor did not believe he suffered from a mental health condition, and that claimant even agreed that he did not have a mental health condition.[25] (Id.).

---

[24] On January 11, 2006, Dr. Roth provided the Georgia Department of Labor a form explaining that the reason he had prescribed claimant Xanax was to treat his tinnitus and that it was not for treatment of a mental condition. (Tr. at 957). Dr. Roth also marked that claimant did not have any limitations in functioning secondary to any mental condition. (Id.).

[25] It appears that based on claimant's reports and Dr. Carter's evaluation of the record that claimant attended some counseling sessions between March of 2005 and April of 2005, see (Tr. at 108, 178, 971); however, there are no treatment notes from any of these sessions in the eCAR.

Therefore, Dr. Carter concluded that claimant had no medically determinable mental impairment. (Id.).[26]

On February 14, 2006, claimant saw Dr. Figa for a follow-up evaluation of his cervical, thoracic, and lumbar pain, and claimant reported improvement of his symptoms with a dull pain in the low back region but continued discomfort in the cervicothoracic region. (Tr. at 1052). Claimant reported that he had been released from his employer due to his prolonged absence from work and that he did not feel he was able to perform gainful employment work activities. (Id.). Dr. Figa refilled some of claimant's medications and instructed him to return in three months for continued pain management. (Id.).

On March 6, 2006, claimant returned to Dr. Barnhill's office for a follow-up appointment at which time claimant reported that he had one episode of diaphoresis and nausea, but that this occurred two days after he received a termination letter from his employer. (Tr. at 1044-45, 1119). Claimant also reported that he had been walking and using an exercise bike a few times per week, but that he was limited by dyspnea and radiculopathy from his thoracic and lumbar disk disease. (Tr. at 1044, 1119). During this appointment, Dr. Barnhill engaged claimant in a lengthy

---

[26] On August 17, 2006, Janet Telford-Tyler, Ph.D. ("Dr. Telford-Tyler"), another DDS non-examining psychological consultant, reviewed Dr. Carter's findings and affirmed his assessment "as written." (Tr. at 1079).

discussion regarding his cigarette smoking, noted that his hyperlipidemia showed good response to combination therapy, and instructed claimant to follow up in three to four months. (Tr. at 1044-45, 1119).[27]

On March 24, 2006, claimant saw Dr. Stovall for a follow-up appointment at which time he had no particular complaints. (Tr. at 1063). At this time, Dr. Stovall noted that claimant's hypertension was well controlled, his hyperlipidemia seemed to be doing well, that he had chronic bronchitis due to smoking, and that his gastroesophageal reflux disease was well controlled. (Id.).

Claimant followed up with Dr. Figa on May 16, 2006, at which time he presented with complaints of continued neck and back pain with associated aching and burning and muscle pain with muscle spasms. (Tr. at 1051). Upon examination, Dr. Figa observed "diffuse axial musculoskeletal myofascial tenderness with tender points throughout the cervical posterior neck and shoulder and thoracic lumbar regions." (Id.). He also observed "discomfort on lateral right hip and gluteal palpation." (Id.). Dr. Figa recommended that claimant proceed with surgical evaluation and return for pain management in three months. (Id.).

---

[27] An echocardiogram from March 17, 2006, revealed a "[l]ow normal ejection fraction, possibly with apical wall motion abnormalities . . . with mild concentric LVH and abnormal left ventricular relaxation." (Tr. at 1048, 1121). However, there were no significant valvular abnormalities. (Id.).

On September 13, 2006, claimant saw Jose E. Garcia-Corrada, M.D. ("Dr. Garcia-Corrada"), with the Emory Spine Center, for his neck and upper lower back pain.  (Tr. at 1081-83).  Claimant reported that he did not have any radicular symptoms, but that most of his pain was in the axial cervical, thoracic, and lumbar region.  (Tr. at 1081).  He also relayed that he had occasional and intermittent right-sided sciatica symptoms that were not persistent, but denied any problems with loss of dexterity, balance, or significant ataxia.  (Id.).  Claimant further explained that his symptoms in his lower back were aggravated by prolonged sitting, standing, and walking, which were alleviated mostly by lying on his back, and that his upper trapezius, neck, and thoracic region symptoms were aggravated by prolonged use of his arms.  (Id.).  However, claimant reported that he was pleased with Dr. Figa's treatment of his pain and with the interventions.  (Id.).  Dr. Garcia-Corrada noted that claimant had been found capable of performing light duty activities, but that claimant reported "not being able to perform these due to prolonged sitting and standing aggravating his pain."  (Tr. at 1082).

Upon physical examination, Dr. Garcia-Corrada noted that claimant had "discomfort with extremes of cervical rotation," tenderness to palpation of the upper trapezius, no significant tenderness to palpation in the thoracic spine, limited lumbar flexion to 50 percent of normal, mild pain at L5-S1 with lumbar extension,

no pain with range of motion in both the upper and lower extremities, and that he was able to walk on heels and toes. (Id.). Dr. Garcia-Corrada also reviewed the imaging data and noted that claimant's cervical spine showed "evidence of multiple spondylotic changes," that there was "evidence of incidental finding of C3 to C5 congenital fusion," that there was "evidence of disk osteophyte complexes and central stenosis" at the C4-C5 and C5-C6 levels, that there was "evidence [of] degenerative changes and spondylotic changes" of the thoracic spine at T10-T11, and that the lumbar spine showed "evidence of L5-S1 anular tear and central disk herniation that was not "associated with critical stenosis at any level." (Id.). Dr. Garcia-Corrada's assessment was "multilevel thoracolumbar spondylosis," "cervical spondylosis without myelopathy," and "cervical stenosis," but he concluded that there was no "evidence of radicular loss nor myelopathy on exam to warrant surgical referral" since "[m]ost of his symptoms [were] axial," which were "weak indications for surgical options." (Id.). Based on his findings, Dr. Garcia-Corrada recommended that claimant continue his treatments and pain management with Dr. Figa. (Tr. at 1082-83).

On October 10, 2006, Bertron Haywood, M.D. ("Dr. Haywood"), another DDS non-examining medical consultant, completed a physical RFC assessment of claimant. (Tr. at 1084-91). Dr. Haywood opined that claimant could sit, stand, and

walk for about six hours in an eight-hour workday. (Tr. at 1085). He also opined that claimant could lift or carry 20 pounds occasionally, 10 pounds frequently, and had no limitations for pushing or pulling other than as shown for lifting and carrying. (Id.). Dr. Haywood also opined that claimant could frequently balance, kneel, crouch, and crawl, but that he could only occasionally climb and stoop. (Tr. at 1086). He found that claimant was also limited in his ability to reach in all directions, including overhead, but that he had no visual or communicative limitations. (Tr. at 1087-88). He also found that claimant should avoid all concentrated exposure to hazards. (Tr. at 1088). In reaching these conclusions, Dr. Haywood considered claimant's allegations of herniated cervical and lumbar disk, arthritis, hypertension, heart disease, depression, and PTSD; Dr. Tashjian's January 2, 2006, assessment finding claimant able to perform light work with postural limitations; treatment notes from Atlanta Orthopedics showing that claimant responded to facet blocks and that he was cleared for light duty work; and Dr. Barnhill's treatment notes showing stable ischemic cardiomyopathy. (Tr. at 1091).

On November 15, 2006, claimant saw Dr. Barnhill for a follow-up appointment at which time claimant explained that he continued to smoke and had no desire to stop. (Tr. at 1118). Claimant underwent an electrocardiogram during this appointment, which showed "some significant T-wave inversion in the apical

leads deeper than he had noticed before." (Id.). At claimant's next appointment with Dr. Barnhill on June 1, 2007, he was again counseled on the need to cease smoking, and Dr. Barnhill noted that claimant's prognosis was limited "with a severe cardiomyopathy and lack of adherence to therapeutic lifestyle changes, which could be beneficial to his health, and in particular the lack of desire to stop smoking or follow any kind of low-cholesterol diet." (Tr. at 1117).

On January 30, 2007, claimant saw Dr. Stovall for a follow-up appointment but he had no particular complaints. (Tr. at 1103). Claimant's hypertension, hyperlipidemia, asthma, and gastroesophageal reflux disease were noted as under excellent control. (Id.). On May 29, 2007, claimant returned to Dr. Stovall's office for a comprehensive history and physical examination and he also complained of severe constipation, rectal bleeding, and abnormal sleeping habits, which were further discussed during his follow-up appointment with Dr. Stovall on June 19, 2007. (Tr. at 1099-1100).[28] On October 26, 2007, claimant reported to Dr. Stovall that he was "generally doing okay" and that he had "no specific complaints." (Tr. at

---

[28] On July 29, 2007, claimant was seen by Zack Z. Martin, M.D. ("Dr. Martin"), for a colonic evaluation due to claimant's history of irritable bowel syndrome, prior diarrhea, constipation, and rare rectal bleeding, and Dr. Martin scheduled claimant for a colonoscopy, which he underwent on August 21, 2007. (Tr. at 1092-94); see also (Tr. at 274 (6/8/98 treatment note for rectal bleeding and diverticulosis)). The colonoscopy "revealed small benign polyps with adenomatous change, diverticula, [and] anal fissure," and a conservative course of treatment was prescribed. (Tr. at 1094).

1097).  Dr. Stovall noted that claimant continued to smoke and drink without making any significant changes in those habits.  (Id.).  Claimant reported that he needed refills for all of his medications, which Dr. Stovall provided him.  (Id.).[29]

On December 18, 2007, claimant saw Dr. Barnhill for a follow-up appointment at which time Dr. Barnhill noted that "[f]rom a cardiac standpoint claimant remain[ed] essentially asymptomatic," despite "some diminished exercise and tolerance but no PND or orthopnea."  (Tr. at 1115-16).  Claimant was continued on his medicinal regimen and encouraged to stop smoking.  (Tr. at 1116).  Thereafter, claimant returned to Dr. Stovall on March 4, 2008, reporting that he had made some lifestyle changes stating that he "discovered that drinking every night and taking Cymbalta caused him to sleep a lot during the day so he decided he would cut down his alcohol intake."  (Tr. at 1096).  However, he also reported that he had continued to smoke with no desire to quit, but that he had not had any chest pains since "nobody has been successful in upsetting me lately."  (Id.).  Claimant again saw Dr. Stovall on July 23, 2008, and relayed that he was "generally doing well."  (Tr. at 1095).

---

[29] On December 6, 2007, Dr. Stovall's office received a call from Gwinnett Clinical Research indicating that claimant enrolled in a Botox study for two years.  (Tr. at 1096).

On July 29, 2008, claimant followed up with Dr. Barnhill at which time Dr. Barnhill noted that claimant was still essentially asymptomatic from a cardiac standpoint.  (Tr. at 1113-14).  Dr. Barnhill's impressions were: progressive underlying COPD, but that claimant continued to smoke; hyperlipoproteinemia, which was having an excellent response to treatment; and ischemic cardiomyopathy, which would be reassessed in light of claimant's continued smoking and sedentary lifestyle.  (Tr. at 1114).  Claimant was instructed to return in six months or sooner, if needed.  (Id.).[30]  On March 17, 2009, claimant saw Dr. Barnhill at which time he noted that claimant had progressive left ventricular dysfunction as shown by the February of 2009 echocardiogram, hyperlipoproteinemia, COPD, and that he was still smoking.  (Tr. at 1108-09).  Dr. Barnhill ordered further testing and advised claimant that he would be considered for a pace-maker device.  (Tr. at 1109).  Thereafter, a stress test from March 23, 2009, showed a large anteroapical and anteroseptal scar, an ejection fraction of 35 percent, and no reversible ischemia.  (Tr. at 1111).

---

[30] An echocardiogram from February 12, 2009, showed claimant's left ventricular ejection fraction was at 30 to 35 percent, that he had dyskinetic apical and anteroseptal walls, a mild concentric left ventricle hypertrophy, an impaired left ventricular relaxation, and a normal valve structure and function.  (Tr. at 1110).

## C.    <u>Evidentiary Hearing</u>

### 1.    *Claimant's Testimony*

At the hearing on April 3, 2009, claimant appeared with his attorney, and testified that he was 54 years old, that he had graduated from high school, and that he had attended one year of college. (Tr. at 19-20, 22). Claimant further testified that the last time he worked was on October 29, 2004, when he was working for Hewlett-Packard as a software support specialist. (Tr. at 22-23). He explained that he had worked for Hewlett-Packard since sometime in 1996, but that he had worked his last four years with the company from his home due to his back injuries. (Tr. at 23). Prior to working for Hewlett-Packard, claimant worked for one year with HBO as a technical support specialist, and prior to that job, he worked with the city of Tempe as a systems analyst and systems manager. (Tr. at 23-24). He testified that he stopped working in October of 2004 after he was in a motor vehicle accident, which caused him to suffer from severe pain and headaches due to injuries to his neck and mid and lower back. (Tr. at 24). He stated that sitting or standing for a prolonged amount of time caused pain in his back and that he had pain with the use of his arms, hands, and legs.[31]  (<u>Id.</u>).

---

[31] With regard to his hands, claimant stated that he had problems with his grip and that he had difficulty opening a jar, tying his tie, and buttoning clothes. (Tr. at 34-35).

With regard to his back injuries, claimant testified that he had been treated with epidural injections, nerve ablations, and medications, which claimant stated caused him to have side effects such as difficulty concentrating and drowsiness. (Tr. at 24-25, 36). He stated that the pain caused him to have to lie down throughout the day,[32] but that if he laid down close in time to having taken his medications, he had "a tendency to drift off" for "an hour and half or two." (Tr. at 25, 30-31).

Claimant also testified that he had a history of heart disease and that he had angina occasionally, but that he did not have chronic edema in his feet, though he stated that there were days if he was "up too much" that he would have swelling that would be relieved by a "night's rest." (Tr. at 25-26). He stated that he gets "very tired, very quickly," and that he would get "winded from activity" due to the enlargement of his heart and the left ventricular aneurysm and stenosis of the right valve. (Tr. at 26). He also stated that his "heart function [was] down to 30 percent, where it ha[d] been running 45 to 50 percent." (Id.). Claimant testified that he also takes medications for his heart condition. (Tr. at 26-27).

With regard to his diagnosis of COPD, claimant relayed that his doctor had told him that he "had the lung function of 112 year old." (Tr. at 27). He stated that he had been prescribed inhalers to treat his COPD, but that he only used one of the

---

[32] Claimant testified that he usually laid down about five hours out of an eight-hour day. (Tr. at 34).

inhalers on an as needed basis. (Id.). As for side effects, claimant stated that the inhalers caused "dry mouth." (Id.). Claimant also testified that he suffered from problems with his short-term memory and that his medications caused him trouble with his ability to concentrate or focus. (Tr. at 31-32). When asked whether he had quit smoking, claimant testified that he had not quit and that he did not intend to quit because he "would rather have the quality of life that [he] enjoy[s], doing the things [he] like[s], eating fatty foods even, rather than quantity of life." (Tr. at 27-28). Claimant stated that due to his doctors' concerns with his heart condition, he was not a candidate for any type of back surgery and therefore, they have continued to treat his back pain conservatively, and that he did not believe that there was any chance of either his heart or back getting any better. (Tr. at 36-37).

When asked whether he was under any sort of treatment for depression, PTSD, or any other mental health impairment, claimant stated that he had seen a psychologist "for awhile but [the psychologist] said that he thought [claimant] was doing okay." (Tr. at 32). With regard to his ability to walk, sit, and stand, claimant testified that it depended on the weather, stating that on a typical day, he would only be able to get halfway through the supermarket, which would be about 30 minutes, before he would have to leave. (Tr. at 28). He also explained that whether he was standing or sitting, his back pain increased with the amount of time he was

in an upright position. (Tr. at 29). He stated that he could stand "anywhere from an hour to an hour and a half before [he was] in enough pain where [he would] need to [lie] down," but that if he was using his hands for any amount of time, his hands would "start hurting, [his] arms [would] ache and it spreads up to the neck and down the back." (Id.). He further stated that he had to give up certain hobbies due to pain, including knitting and crochet, but that he could sit at the computer and check e-mails for about "an hour or less." (Tr. at 29-30). As for lifting, claimant testified that he could safely lift between 10 to 15 pounds. (Tr. at 30).

As for his daily routine, claimant testified that he would normally wake up, take his medications, eat breakfast, check some e-mails on his computer, and then lay down for "a while." (Id.). He stated that he would also watch television and check the mail. (Id.). He explained that he could perform certain household chores, including doing the laundry, and that if he felt good, he would also prepare his own meals, but if he was not up for it, he would "go out and get fast food" or call a food delivery service. (Tr. at 30-31). Claimant stated that he could drive, but that he limited his driving due to the side effects of his medications. (Tr. at 31). Claimant also testified that he had nights where he could not sleep at all due to his pain, but that he took Cymbalta, which had "a tendency to cause drowsiness." (Tr. at 31-33, 35-36). Other nights, claimant stated that he would sleep three to five hours. (Tr. at

35-36). Claimant further stated that he did not socialize but that as part of his treatment for his tinnitus, he was advised to go out "into a noisy environment at least once a week" in order to retrain "the brain to ignore noises" and that he frequented a particular restaurant for that reason. (Tr. at 33).

2. *Testimony of the Vocational Expert*

Tina Baker-Ivey testified by telephone as the vocational expert ("VE") at the hearing. (Tr. at 19, 21, 38-42). The VE classified claimant's past work as a data center operator as having a specific vocational preparation ("SVP")[33] of 7, but her response as to the exertional level was inaudible, <u>see</u> (Tr. at 39), though it appears later in the transcript that she noted it as sedentary, <u>see</u> (Tr. at 40). She also classified claimant's past work as a software support specialist and a technical consultant as sedentary work with an SVP of 8. (Tr. at 39). Finally, the VE classified claimant's past work as a technical support analyst as light work with an SVP of 7. (<u>Id.</u>).

---

[33] Social Security Ruling ("SSR") 00-4p discusses the relationship between SVP time and the skill level definitions set forth in the regulations, and explains that "unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the [Dictionary of Occupational Titles]." SSR 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000). SSRs "'are binding on all components of the [SSA].'" <u>Brewer v. Astrue</u>, No. 8:09-CV-132-T-27TGW, 2010 WL 454916, at *1 n.1 (M.D. Fla. Feb. 9, 2010) (<u>quoting</u> <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 n.9 (1990); 20 C.F.R. § 402.35(b)(1)). "Although SSRs do not have the force of law, they are entitled to deference if consistent with the Social Security Act and regulations." <u>Id.</u> (citation omitted).

The ALJ then posed hypothetical questions to the VE. (Tr. at 39-42). The ALJ instructed the VE to assume claimant could lift 20 pounds occasionally and 10 pounds frequently; could sit for up to 6 hours in an 8-hour workday; could walk or stand for up to 6 hours in an 8-hour workday, but for only 30 minutes at a time; could occasionally push or pull with his upper and lower extremities; could occasionally stoop, crouch, crawl, or climb stairs; could not bend at the waist or climb ladders, ropes, or scaffolds; could frequently, but not repetitively, use his hands for handling, fingering, and feeling; and who had environmental restrictions in that he would have to avoid extremes in temperature and humidity and all exposure to dust, gases, odors, fumes, and unventilated air, and asked if claimant could perform any of his past work. (Tr. at 39-40). The VE responded that the claimant could not perform any of his past work due to the hypothetical limitation with regard to claimant's hands and his inability to use them repetitively as well as the limitation that he walk only 30 minutes at a time. (Tr. at 40-41). However, the VE testified that if these limitations were eliminated from the hypothetical, the claimant could perform his past work. (Tr. at 41). Specifically, the VE testified that claimant could perform his past work with the other limitations stated in the ALJ's hypothetical if he could walk for up to an hour at a time for a total of two hours and he had no limitation with regard to his hands. (Id.).

The ALJ then instructed the VE to assume an individual similar in age, education, and vocational background as claimant with the original set of limitations, and asked whether that individual would be able to perform other jobs in the national and regional economy, and the VE responded that there would be no jobs that the individual could perform. (Tr. at 41-42).

## D.    ALJ and Appeals Council

### 1.    *Findings of the ALJ*

By decision dated September 1, 2009, the ALJ denied claimant's application for DIB. (Tr. at 4-16). Specifically, the ALJ made the following findings of fact:

1.    The claimant meets the insured status requirements of [the Act] through December 31, 2009.

2.    The claimant has not engaged in substantial gainful activity since October 30, 2004, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: coronary artery disease, degenerative disc disease at L5-S1, stenosis of the cervical spine, and asthma (20 CFR 404.1520(c)). He has non-severe impairments of [PTSD] and tinnitus.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the [RFC] to perform less than the full range of light work as defined in 20 CFR 404.1567(b) due to the following limitations: he is able to lift twenty pounds

occasionally; frequently lift or carry less than ten pounds; sit for up to six hours; walk or stand for two hours in an eight-hour work day but only one hour at a time; occasionally push and pull with the upper and lower extremities; occasionally stoop, crouch, crawl, stair climb; but no bending; no ladder, rope or scaffold climbing; and he should avoid extremes in temperature and humidity, dust, gases, odors, fumes and unventilated air.

6.     The claimant is capable of performing past relevant work as a data center operator; software support specialist; and technical consultant.  This work does not require the performance of work-related activities precluded by the claimant's [RFC] (20 CFR 404.1565).

7.     The claimant has not been under a disability, as defined in [the Act], from October 30, 2004, through the date of this decision (20 CFR 404.1520(f)).

(Tr. at 9-15).

## 2.     *Appeals Council Decision*

Claimant requested a review of the ALJ's hearing decision, and on May 17,

2011, the Appeals Council denied claimant's request for review, making the ALJ's

decision the final decision of the Commissioner. (Tr. at 1-2, 1122-24).[34]

## IV. STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see also Driver v. Astrue, Civil Action File No. 1:07-CV-3014-AJB, 2009 WL 631221, at *14 (N.D. Ga. Mar. 9, 2009). The impairment

_____

[34] Claimant asserts that he was in another motor vehicle accident on February 19, 2010, which he contends was "an intervening event between the ALJ's ruling and the ruling of the Appeals Panel." [Doc. 1 at 14]. However, it does not appear that claimant submitted any additional records to the Appeals Council for consideration, see generally, [Doc. 6], despite claimant's assertions that this accident "resulted in another round of injuries requiring treatment," [Doc. 1 at 14]. In any event, "[n]ew evidence presented to the Appeals Council must relate to the period on or before the ALJ's hearing decision," Faust v. Astrue, No. 3:11–CV–98–CAR–MSH, 2012 WL 1833386, at *5 (M.D. Ga. Apr. 24, 2012), adopted by 2012 WL 1831529, at *1 (M.D. Ga. May 18, 2012) (citation omitted), and here, the relevant period related to this claim is prior to the ALJ's decision of September 1, 2009, id. at *6; see also (Tr. at 15), but any supposed new evidence would have been dated after the alleged February 19, 2010, car accident, see [Doc. 1 at 14]. Thus, even if claimant had submitted additional evidence related to his injuries from the February of 2010, accident, the Appeals Council would not be required to consider it. See Williams v. Astrue, Civil Action File No. 1:09–CV–02689–AJB, 2011 WL 1131328, at *21 (N.D. Ga. Mar. 28, 2011) (finding the Appeals Council was not even required to consider new evidence dated April 13, 2009, when the ALJ's decision was issued on March 26, 2009). Furthermore, claimant remained insured through December 31, 2009, and he therefore had to establish disability on or before that date in order to be entitled to DIB. (Tr. at 7); see also Benson v. Comm'r of Soc. Sec., Civil Action No. 3:11–cv–4629, 2012 WL 3133937, at *11 (D.N.J. July 31, 2012).

or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)-(3); see also Arnold v. Astrue, Civil Action File No. 1:08-CV-1747-AJB, 2010 WL 553230, at *9 (N.D. Ga. Feb. 9, 2010).

"The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner." Arnold, 2010 WL 553230, at *9. "The claimant bears the primary burden of establishing the existence of a 'disability' and therefore entitlement to disability benefits." Id. (citing 20 C.F.R. § 404.1512(a)). The Commissioner utilizes a five-step sequential process to determine whether the claimant has met the burden of proving disability. See Scott v. Comm'r of Soc. Sec., No. 11–15252, 2012 WL 5358868, at *1 (11th Cir. Oct. 31, 2012) (per curiam) (unpublished); Brooks v. Barnhart, 133 F. App'x 669, 670 (11th Cir. 2005) (per curiam) (unpublished); Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001); Mayfield v. Astrue, Civil Action File No. 1:00-CV-2778-JFK, 2010 WL 147202, at *5 (N.D. Ga. Jan. 7, 2010); 20 C.F.R. § 404.1520(a)(4).

Claimant must prove at step one that he is not undertaking substantial gainful activity. See 20 C.F.R. § 404.1520(a)(4)(i). At step two, claimant must prove that he is suffering from a severe impairment or combination of impairments which significantly limits his ability to perform basic work-related activities. See 20 C.F.R. § 404.1520(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 [Listing of Impairments], claimant will be considered disabled without consideration of age, education and work experience. See 20 C.F.R. § 404.1520(a)(4)(iii). At step four, if claimant is unable to prove the existence of a listed impairment, he must prove that the impairment prevents performance of past relevant work. See 20 C.F.R. § 404.1520(a)(4)(iv). At step five, the regulations direct the Commissioner to consider claimant's RFC, age, education and past work experience to determine whether he can perform other work besides past relevant work. See 20 C.F.R. § 404.1520(a)(4)(v).[35] "The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform." Holmes v. Astrue, Civil Action File No. 1:09-CV-01523-AJB, 2010 WL

_____

[35] As explained by Doughty, the temporary shifting of the burden at step five to the Commissioner is a creature of judicial gloss on the Social Security Act and not mandated by the statutes. 245 F.3d at 1278 n.2; see also Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995) (per curiam) (citation omitted) ("Once the finding is made that a claimant cannot return to prior work the burden of proof shifts to the Secretary to show other work the claimant can do.").

2196600, at *12 (N.D. Ga. May 27, 2010). In order to be considered disabled, claimant must prove an inability to perform the jobs that the Commissioner lists. Id. (citing Doughty, 245 F.3d at 1278 n.2).

"If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends." Id. (citations omitted); see also 20 C.F.R. § 404.1520(a)(4). "Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy." Holmes, 2010 WL 2196600, at *12 (citations omitted).

## V. SCOPE OF JUDICIAL REVIEW

The scope of judicial review of a denial of Social Security benefits by the Commissioner is limited. Lynch v. Astrue, 358 F. App'x 83, 86 (11th Cir. 2009) (per curiam) (unpublished) (citation omitted). Judicial review of the administrative decision addresses three questions: (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues. Fields v. Harris, 498 F. Supp. 478, 488 (N.D. Ga. 1980) (citations omitted). This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam)

(quoting Phillips v. Barnhart, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004)); see also Bryant v. Comm'r of Soc. Sec., 451 F. App'x 838, 839 (11th Cir. 2012) (per curiam) (unpublished); Lynch, 358 F. App'x at 86. If supported by substantial evidence, and proper legal standards were applied, the findings of the Commissioner are conclusive. Dyer, 395 F.3d at 1210; Phillips, 357 F.3d at 1240 n.8; Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997) (citations omitted).

Substantial evidence has been defined as "'more than a scintilla, but less than a preponderance.'" Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (quoting Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983)); see also Lynch, 358 F. App'x at 87; Foote, 67 F.3d at 1560; Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) (citations omitted). The evidence must be such that "'a reasonable mind might accept [it] as adequate to support [the Commissioner's] conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)); see also Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted); Moore v. Astrue, Civil Action No. 5:08-CV-92 (CAR), 2009 WL 1025389, at *1 (M.D. Ga. Apr. 15, 2009). In considering the evidence in the record, this Court must consider the record as a whole. Lynch, 358 F. App'x at 86 (citations omitted). It may not affirm the Commissioner's decision by referring only to those parts of the record which support the same conclusion. Tieniber v. Heckler, 720 F.2d

1251, 1253 (11th Cir. 1983) (per curiam) (citations omitted). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951). However, if the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the evidence preponderates against the Commissioner's decision. Dyer, 395 F.3d at 1210 (citation omitted); Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158-59 (11th Cir. 2004) (per curiam) (citation omitted); Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003) (per curiam) (citation omitted). In contrast, review of the ALJ's application of legal principles is plenary. Foote, 67 F.3d at 1558 (citation omitted); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam) (citing Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982)).

## VI. ANALYSIS OF CASE

Claimant asserts that the ALJ's decision is not supported by substantial evidence and should be reversed because the ALJ erred at step four of the sequential analysis in finding that he retained the RFC to perform his past relevant work in that she failed to consider all of the relevant medical evidence, and instead chose to give more weight to outdated medical evidence; failed to find that his PTSD and tinnitus were severe impairments; and improperly evaluated the VE's testimony and his credibility. [Doc. 1]. For the following reasons, the undersigned rejects these

arguments and finds that the ALJ's decision is supported by substantial evidence and that a remand is not warranted in this case.

**A.    The ALJ properly assessed claimant's RFC based on substantial medical evidence in the record**

Claimant argues that the ALJ's RFC determination that he can perform less than the full range of light exertional work is erroneous and not supported by substantial evidence because she gave more weight to Dr. Jordan's opinions than to Dr. Barnhill's opinions, she failed to recognize the progressive nature of his back issues by giving weight to both of the physical work performance evaluations, and she failed to fully consider Dr. Fine's treatment records.  [Doc. 1 at 15-20]; see also (Tr. at 468).  The Commissioner contends that the ALJ properly assessed all of the medical evidence.  [Doc. 17 at 5-15].

"A claimant's RFC is [his] ability to do physical and mental work activities on a sustained basis despite [his] limitations from [his] impairments."  Wilver v. Astrue, No. 8:07-CV-488-T-EAJ, 2008 WL 2824815, at *4 (M.D. Fla. July 21, 2008) (citing 20 C.F.R. § 404.1520(e)); see also Land v. Comm'r of Soc. Sec., No. 12–11834, 2012 WL 5313342, at *2 (11th Cir. Oct. 26, 2012) (per curiam) (unpublished).  "In making an RFC determination, the ALJ must consider the medical evidence as well as other evidence in the record."  Wilver, 2008 WL 2824815, at *4 (citation omitted); see also 20 C.F.R. § 404.1527(d) (the Commissioner is obligated to evaluate all medical

opinions submitted on behalf of the claimant in regard to his claim for benefits); Pettus v. Astrue, 226 F. App'x 946, 949 (11th Cir. 2007) (per curiam) (unpublished) (citations and internal marks omitted) ("[RFC] determinations are made based on all of the relevant medical and other evidence.").

"'Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions.'" Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1178-79 (11th Cir. 2011) (alterations in original) (quoting 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)); see also Beegle v. Soc. Sec. Admin., Comm'r, 482 F. App'x 483, 486 (11th Cir. 2012) (per curiam) (unpublished). "The Commissioner evaluates every medical opinion that it receives, regardless of the source," and "[t]hus, both examining and nonexamining sources provide opinion evidence for the ALJ to consider in rendering a decision." Derrico v. Comm'r of Soc. Sec., Civil Action File No. 1:09–CV–03138–AJB, 2011 WL 1157690, at *17 (N.D. Ga. Mar. 29, 2011) (citations omitted). "'The Regulations establish a 'hierarchy' among medical opinions that provides a framework for determining the weight afforded each medical opinion.'" Cooks v. Astrue, Civil Action No. 1:10–cv–02714–TWT–RGV,

2012 WL 567189, at *11 n.9 (N.D. Ga. Jan. 24, 2012), adopted by 2012 WL 567187, at

*1 (N.D. Ga. Feb. 21, 2012) (quoting Belge v. Astrue, No. 3:09-cv-529-J-JRK, 2010 WL

3824156, at *3 (M.D. Fla. Sept. 27, 2010) (footnote omitted)).

An opinion of a treating source "must be given substantial or considerable

weight unless 'good cause' is shown to the contrary."[36]   Lewis, 125 F.3d at 1440

(citations omitted); see also Forrester v. Comm'r of Soc. Sec., 455 F. App'x 899, 902

(11th Cir. 2012) (per curiam) (unpublished) (citation omitted); Miller v. Comm'r of

Soc. Sec. Admin., 279 F. App'x 792, 792 (11th Cir. 2008) (per curiam) (unpublished)

(citation omitted); McKeithen v. Astrue, Civil Action File No. 1:09–CV–02389–AJB,

2011 WL 1118490, at *14 (N.D. Ga. Mar. 25, 2011) (citations omitted); 20 C.F.R. §

---

[36] Specifically, the Eleventh Circuit has concluded that "good cause" exists when "the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Phillips, 357 F.3d at 1240-41 (citation omitted); Lewis, 125 F.3d at 1440 (citations omitted); see also Gainous v. Astrue, 402 F. App'x 472, 474 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted).  Moreover, under SSR 96-5p, the opinion of a treating physician on an issue reserved to the Commissioner is not entitled to controlling weight.  See Lewis, 125 F.3d at 1440 (stating that the court was concerned with the medical consequences of the doctors' evaluations, not their opinions of the legal consequences of claimant's condition).  However, "conclusory statements by an ALJ to the effect that an opinion is inconsistent with or not bolstered by the medical record are insufficient to show an ALJ's decision is supported by substantial evidence unless the ALJ articulates factual support for such a conclusion."  Kahle v. Comm'r of Soc. Sec.,845 F. Supp 2d 1262, 1272 (M.D. Fla. 2012), adopted at 1264 (citations omitted); see also Young v. Astrue, No. 8:11–cv–21–T–TBM, 2012 WL 921397, at *5 (M.D. Fla. Mar. 19, 2012).

404.1527(c). Additionally, "the 'opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician.'" See Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir. 1985) (per curiam) (quoting Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. Unit B Nov. 1981)[37]); Ahearn v. Comm'r of Soc. Sec., No. 6:11–cv–52–Orl–GJK, 2012 WL 619765, at *8 (M.D. Fla. Feb. 27, 2012) (citation omitted); Driver, 2009 WL 631221, at *19 (citations omitted); see also Kahle, 845 F. Supp. 2d at 1271 (citations omitted) ("While the opinion of a one-time examining physician may not be entitled to deference, especially when it contradicts the opinion of a treating physician, the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician."). Indeed, "[t]he opinions of nonexamining, reviewing physicians, . . . when contrary to those of the examining physicians, are entitled to little weight, and standing alone do not constitute substantial evidence." Sharfarz v. Bowen, 825 F.2d 278, 280 (11th Cir. 1987) (per curiam) (citation omitted); see also Kemp v. Astrue, 308 F. App'x 423, 427 (11th Cir. 2009) (per curiam) (unpublished) (citation omitted); Johns v. Bowen, 821 F.2d 551, 554 (11th Cir. 1987) (per curiam); Spencer ex rel. Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir. 1985) (per curiam) (citation and

---

[37] In Stein v. Reynolds Securities, Inc., 667 F.2d 33, 34 (11th Cir. 1982), the Eleventh Circuit adopted as binding precedent all of the post-September 30, 1981, decisions of Unit B of the former Fifth Circuit.

internal marks omitted) ("We accord little weight to the opinion of a reviewing physician if it is contrary to the opinion of the only physician to examine the patient."); Derrico, 2011 WL 1157690, at *17 (citations omitted); Driver, 2009 WL 631221, at *19 (citation omitted).

"The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician . . . ." Lewis, 125 F.3d at 1440 (citation omitted); see also Jarrett v. Comm'r of Soc. Sec., 422 F. App'x 869, 873 (11th Cir. 2011) (per curiam) (unpublished) (citations omitted); Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1216 (11th Cir. 1991); 20 C.F.R. § 404.1527(c)(2) (requiring the agency to "give good reasons" for not giving weight to a treating physician's opinion). Failure to do so is reversible error. Jarrett, 422 F. App'x at 873 (citations omitted); Lewis, 125 F.3d at 1440 (citation omitted). "And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995) (citation omitted); see also O'sNeal v. Astrue, No. 3:08-cv-63-J-MCR, 2009 WL 702865, at *7 (M.D. Fla. Mar. 17, 2009).

However, the nature of the relationship between the doctor and the claimant is only one factor used to determine the weight given to a medical opinion. See 20 C.F.R. § 404.1527. Other factors that are considered in determining the weight to

give a medical opinion include the length of any physician/claimant relationship and the frequency of examination, the nature and extent of the physician/claimant relationship as it relates to the disability complaint, the internal consistency of the physician's opinion, and the amount of relevant medical evidence which supports that physician's opinion.  See id.; see also Byrd v. Astrue, Civil Action No. 1:07cv1036-CSC, 2008 WL 3821971, at *2 (M.D. Ala. Aug. 13, 2008) (citation omitted) ("[T]he weight afforded to a physician's conclusory statements depends upon the extent to which they are supported by clinical or laboratory findings and are consistent with other evidence of the claimant's impairment.").  "The ALJ may 'reject the opinion of any physician when the evidence supports a contrary conclusion.'" Byrd, 2008 WL 3821971, at *2 (citation omitted) (quoting Bloodsworth, 703 F.2d at 1240).

The ALJ specifically discussed and weighed the various medical opinions in accordance with the regulations in reaching her RFC determination that claimant could perform less than the full range of light work in that he could only lift 20 pounds occasionally; lift or carry less than 10 pounds frequently; sit for up to 6 hours; walk or stand for 2 hours in an 8-hour workday but for only 1 hour at a time; occasionally push and pull with his upper and lower extremities; occasionally stoop, crouch, crawl, and stair climb; no bending; no ladder, rope, or scaffold climbing; and

that he should avoid extremes in temperature and humidity, dust, gases, odors, fumes, and unventilated air. See (Tr. at 9-15). The ALJ discussed the opinions of treating physicians, Drs. Jordan, Fine, Barnhill, Stovall, Weil, Garcia-Corrada, and Figa; examining physical therapist, Whitman; examining psychiatrist, Dr. Lacy; examining physicians, Drs. Houssami and Roth; and the opinions of non-examining DDS medical consultants, Drs. Haywood, Tashjian, and Carter. (Id.).

With regard to claimant's heart conditions, the ALJ specifically discussed his history of coronary artery disease, including that he had suffered five heart attacks between 1987 and 1995, and that the medical evidence showed that he had been diagnosed with chronic heart failure, ventricular dysfunction, and pain due to ischemia, all of which were noted as well controlled with medications. (Tr. at 11). The ALJ then discussed Dr. Jordan's May 20, 1998, letter in which he stated that despite claimant's potentially multiple disabling conditions, he could perform within an appropriate work environment, see (id.); see also (Tr. at 281), and the fact that claimant did in fact return to full-time work until his motor vehicle accident in October of 2004, (Tr. at 11).

Additionally, the ALJ discussed Dr. Fine's treatment notes, including his notation from July 15, 2004, which showed that claimant was stable. (Tr. at 12); see also (Tr. at 329-30). The ALJ then discussed Dr. Barnhill's treatment of claimant,

noting that in March of 2006, he classified claimant essentially with moderate impairment, that his medical records showed that claimant's cardiomyopathy remained stable through 2005 and 2006, that his treatment notes from December of 2007 also showed stable angina without any recent symptoms, and that his most recent treatment note from March of 2009 showed that claimant had no shortness of breath, chest pain, murmurs, rubs, clicks or gallops, jugular vein distention, significant peripheral edema, or paroxysmal nocturnal dyspnea. (Tr. at 12); see also (Tr. at 813, 818, 1044-47, 1049, 1108-09, 1111, 1113-16, 1119).[38]  Finally, the ALJ discussed Dr. Stovall's records, including that he had noted as of July of 2008 that claimant's ischemic cardiomyopathy was asymptomatic and that he did not require any special treatment or management of his breathing issues or COPD. (Tr. at 12-13); see also (Tr. at 1095).

After thoroughly reviewing these opinions, the ALJ gave significant weight to Dr. Jordan's opinions, finding that "[h]e treated the claimant over a number of

---

[38] The ALJ also discussed the results of claimant's numerous echocardiograms and stress tests that were performed, noting that the records showed that claimant's left ventricular functioning had not significantly changed since 2003 and that claimant had been able to engage on gainful employment during his ongoing heart conditions. (Tr. at 12); see also (Tr. at 813, 818, 1048-49, 1110, 1118, 1121).  In fact, the ALJ even discussed Dr. Barnhill's March of 2009 treatment note that indicated claimant had progressive left ventricular dysfunction, but explained that there was no evidence that it would prevent claimant from performing work activities. (Tr. at 12); see also (Tr. at 1108-09).

years, his treatment ha[d] been based upon objective medical testing and his opinion was consistent with the evidence as a whole."  (Tr. at 14).  Claimant contends that the ALJ erred in crediting Dr. Jordan's opinion over that of Dr. Barnhill, see [Doc. 1 at 16]; however, to the extent the ALJ gave more weight to Dr. Jordan, his opinions were consistent with the treatment notes from Dr. Barnhill and with the medical evidence as a whole.    Indeed, Dr. Barnhill repeatedly noted claimant's cardiomyopathy and angina as stable and that he was "doing well," see (Tr. at 351, 358-59, 813, 1044-47, 1049, 1111, 1113-16),[39] which was also consistent with the opinions of Dr. Fine[40] and Dr. Stovall that claimant was essentially asymptomatic

_____

[39] In fact, the Court notes that the ALJ's RFC assessment was even more limited than that of Dr. Barnhill's assessment in June of 2004.  See (Tr. at 10, 778-79).  Indeed, Dr. Barnhill only limited claimant to no lifting of any object greater than 25 pounds, found that he had no restrictions for standing or walking but that he should be able to take a stretch break from sitting every 60 minutes, and did not restrict him in any way from climbing, reaching above his shoulders, kneeling, simple grasping, or to certain exposures, see (Tr. at 778-79), whereas the ALJ limited claimant to lifting only 20 pounds occasionally and less than 10 pounds frequently, to walking or standing for 2 hours out of an 8-hour workday but at only 1 hour at a time, to limited climbing, and to avoiding certain exposures in the environment, see (Tr. at 10). Although Dr. Barnhill later concluded that claimant's prognosis was limited in June of 2007, he also noted that it was due to claimant's "lack of adherence to therapeutic lifestyle changes, which could be beneficial to his health, and in particular the lack of desire to stop smoking or follow any kind of low-cholesterol diet," see (Tr. at 1117), and found in December of 2007 and July of 2008, that claimant was stable and remained asymptomatic, see (Tr. at 1113-16).

[40] Claimant argues that the ALJ erred by failing to mention that "Dr. Fine perform[ed] a computerized spirometry and report[ed] to [him] that he had the lung function of a 112 yr. old." [Doc. 1 at 18-19].  However, "[t]he ALJ need not mention

74

from a cardiac standpoint, <u>see</u> (Tr. at 329-20, 343, 348, 368, 374, 378, 812, 817-18, 1063, 1095-97, 1103). Thus, the Court finds that the ALJ properly considered and weighed all of the medical record evidence with regard to claimant's cardiac impairments and limitations.

The ALJ also properly considered claimant's cardiac impairments in combination with his chronic neck and back pain. Specifically, the ALJ discussed claimant's degenerative disc disease and stenosis of the cervical spine, detailing how claimant had first injured his spine in 1999 and then re-injured it in May of 2004 when he was diagnosed with a L5-S1 disk herniation. (Tr. at 12). The ALJ further discussed claimant's treatment records, including MRIs performed on August 4,

---

every piece of evidence in support of [her] determination." <u>Paschal v. Astrue</u>, Civil Action No. 1:10cv592–WC, 2011 WL 2261986, at *5 (M.D. Ala. June 8, 2011) (<u>quoting</u> <u>Dyer</u>, 395 F.3d at 1211 (first alteration in original) (internal marks omitted) ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in [her] decision, so long as the ALJ's decision enables the reviewing court to determine the ALJ considered the evidence.")). Here, it is clear that the ALJ considered all of the relevant medical evidence, including Dr. Fine's treatment notes, in evaluating claimant's cardiac conditions and associated functional limitations. <u>See</u> (Tr. at 11-15). Moreover, claimant's arguments that the ALJ erred by overlooking the "diagnostic codes from Dr. Barnhill's billing statement that was provided to [her] when faxing back [claimant's] acknowledgement of hearing notice," [Doc. 1 at 20], is completely without merit as a mere "diagnosis of a condition is insufficient to establish that a claimant's impairment is severe," <u>Dereyes v. Astrue</u>, Civil Action No. 5:11–CV–02727–KOB, 2012 WL 4479581, at *10 (N.D. Ala. Sept. 26, 2012) (citations omitted); <u>see also</u> <u>In re Petition of Sullivan</u>, 904 F.2d 826, 845 (3d Cir. 1990) (finding claimant must establish not just a diagnosis, but functional limitations preventing performance of substantial gainful activity).

2004, and February 17, 2005; his physical therapy sessions; his epidural injections and radiofrequency neurotomies; and his treatments with Drs. Weil, Garcia-Corrada, and Figa. (Tr. at 12-15). After reviewing all of the medical evidence, the ALJ rejected Dr. Weil's July 22, 2004, work restrictions since claimant had successfully returned to work after that assessment prior to his October 30, 2004, motor vehicle accident, which is the time claimant alleges he became disabled. (Tr. at 13-14). Thereafter, the ALJ gave significant weight to the limitations established in Whitman's December of 2005 FCE,[41] as well as the opinions of Drs. Haywood and Tashjian,[42] the DDS medical consultants, finding that these opinions were consistent

---

[41] In particular, the FCE specifically evaluated claimant's abilities in light of his diagnoses of cervical herniated nucleus pulposus, cervical strain, lumbar strain, and an L5-S1 degenerative disc, and found that claimant could tolerate repetitive use of both hands and feet, that his abilities actually exceeded most of his job demands, and that he was capable of sustaining light level work. (Tr. at 166-72, 929-35).

[42] On January 2, 2006, Dr. Tashjian evaluated claimant's abilities in light of his degenerative disc disease, coronary artery disease, hypertension, and bronchitis, and she concluded that he could sit, stand, and walk for 6 hours in an 8-hour workday; could lift or carry 20 pounds occasionally and 10 pounds frequently; was unlimited for pushing or pulling; could frequently balance, kneel, and crouch; could occasionally climb ramps and stairs, stoop, and crawl; could never climb ladders, ropes, or scaffolds; and was limited in his ability to reach in all directions. (Tr. at 948-56). Approximately nine months later, Dr. Haywood evaluated claimant and concurred with Dr. Tashjian's assessment with the exception that he found claimant could also frequently crawl and that he should avoid all concentrated exposure to hazards. (Tr. at 1084-91).

with the medical evidence, and that the ALJ's RFC encompassed all limitations posed by his neck and back impairments. (Tr. at 14).

Claimant contends that the ALJ erred in crediting Drs. Haywood and Tashjian's opinions since they were "4-5 years old" and his "degenerative disk disease, spinal spondyliosis [sic], narrowing of the dura, narrowing of the intervertebral spaces, [and] stenosis of the facet joints are all progressive. . ." [Doc. 1 at 18]. Claimant, however, overlooks the fact that the ALJ specifically discussed the most recent medical evidence in the record, <u>see</u> (Tr. at 13), none of which is contrary to her assessment of claimant's RFC. Indeed, Dr. Tashjian's physical RFC assessment was in January of 2006, <u>see</u> (Tr. at 948-56), and Dr. Haywood's assessment was in October of 2006, <u>see</u> (Tr. at 1084-91), and there are no further treatment records after Dr. Haywood's assessment that specifically pertain to claimant's neck and back in the record.[43] In fact, most of the treatment notes after Dr. Haywood's assessment in October of 2006 show that claimant walked, used the

---

[43] The records in between Drs. Tashjian and Haywood's opinions show that claimant was receiving treatment from Dr. Figa, which provided him relief, albeit fleeting at times, and that he had been walking and using the exercise bike. (Tr. at 1044, 1052-53, 1063, 1119). In fact, as of September of 2006, Dr. Garcia-Corrada observed that claimant only had discomfort with extreme cervical rotation, that there was no significant tenderness to palpation in the thoracic spine region, and that he had no pain with range of motion in both his upper and lower extremities, and he concluded that claimant should continue with his conservative treatments with Dr. Figa, especially in light of claimant's reports that he was pleased with Dr. Figa's pain management. (Tr. at 1081-83).

exercise bike, that he had full range of motion of his extremities, generally had no

particular complaints, and was "doing okay," and there was no indication of any

worsening of his symptoms. (Tr. at 1095-97, 1100, 1103, 1117-18). Given the medical

record evidence, the Court finds that the ALJ's decision that claimant retained the

RFC to perform his past relevant work and was therefore not disabled is supported

by substantial evidence.[44] See Crawford, 363 F.3d at 1158-59; see also Khawaja v.

Shalala, 20 F.3d 1170, 1994 WL 144806, at *3-4 (5th Cir. 1994) (per curiam)

(unpublished) (finding that substantial evidence supported ALJ's decision that

claimant could perform past relevant work where past relevant work was consistent

with RFC limitations included in medical record); Loar v. Astrue, No.

2:10-cv-593-FtM-29SPC, 2011 WL 5357629, at *11-12 (M.D. Fla. Oct. 12, 2011),

adopted by 2011 WL 5358670, at *1 (M.D. Fla. Nov. 7, 2011) (finding that "substantial

evidence in the record that were discussed and considered by the ALJ, including

---

[44] Despite claimant's arguments that the ALJ erred in her reporting of the VE's testimony, see [Doc. 1 at 26], the VE testified that an individual who was limited to lifting 20 pounds occasionally and 10 pounds frequently; could sit for up to 6 hours in an 8-hour workday; could walk or stand for up to an hour at a time for a total of two hours in an 8-hour workday; could occasionally push or pull with his upper and lower extremities; could occasionally stoop, crouch, crawl, or climb stairs; could not bend at the waist or climb ladders, ropes, or scaffolds; had no limitations with regard to his hands; and who had environmental restrictions in that he would have to avoid extremes in temperature and humidity and all exposure to dust, gases, odors, fumes, and unventilated air, could perform claimant's past work. (Tr. at 39-41).

medical records, [a consultative examination], and [claimant's] daily activities and work history, supports the ALJ's RFC finding that [claimant] could perform medium work," including her past relevant work as a fast food worker).

**B.    The ALJ's finding at step two that claimant's PTSD and tinnitus were not severe impairments is supported by substantial evidence**

Claimant contends that the ALJ erred by finding that his PTSD and tinnitus were non-severe. [Doc. 1 at 16-17, 19]; <u>see also</u> (Tr. at 9-10). In reaching this decision, the ALJ stated in pertinent part:

> The evidence shows the only diagnosis of PTSD is found in the neuropsychological evaluation of Dr. [Lacy], who reported the claimant has no organic brain injury and no significant functional limitations. State consultant [Dr. Carter], completed a [PRT] assessment dated January 12, 2006, that shows the claimant has no medically determinable mental impairment. Additionally, in January 2006, after limited counseling, the claimant acknowledged he believed he had no mental impairment and was no longer suffering from PTSD. There is no evidence the claimant's alleged PTSD has significantly interfered with his ability to perform basic work functions.

> Although, the claimant testified that he had tinnitus, the treatment notes from neurologist Dr. [] Houssami, dated December 27, 2004, show he developed mildly severe tinnitus as a component of post-percussion syndrome following his October 30, 2004 automobile accident. A subsequent evaluation performed by Dr. [] Roth, on October 24, 2005, shows audiogram and tympanogram testing confirmed the claimant with normal hearing despite the tinnitus. The most recent evidence consists of treatment notes from Dr. [] Stovall, dated January 30, 2007, that shows the claimant reported tinnitus treatment, but there is no evidence confirming the treatment. As such, there is no evidence that tinnitus significantly interferes with the

claimant's ability to perform basic work functions and is determined to
be a non-severe impairment.

(Tr. at 9-10 (internal citations omitted)).

"Under applicable regulations, a medically determinable impairment is one

that results from anatomical, physiological, or psychological abnormalities which

can be shown by medically acceptable clinical and laboratory diagnostic

techniques." Ponce v. Astrue, No. ED CV 09-01585-VBK, 2010 WL 2104751, at *1

(C.D. Cal. May 24, 2010) (citations and internal marks omitted). "The impairment

must be established by medical evidence consisting of signs, symptoms, and

laboratory findings, not only by [claimant's] statement of symptoms." Id. (alteration

in original) (citations and internal marks omitted). "The determination of the

existence or non-existence of a severe impairment occurs at what is commonly

denominated step two of the five-step evaluation." Id.; see also Hall v. Astrue, No.

3:07-cv-1053-J-JRK, 2009 WL 890389, at *6 (M.D. Fla. Mar. 31, 2009) (citing 20 C.F.R.

§ 404.1520(a)(4)(ii)).

In the context of a Social Security disability benefits case, "an impairment is

'severe' if it 'significantly limits claimant's physical or mental ability to do basic

work activities.'" Salazar v. Comm'r of Soc. Sec., 372 F. App'x 64, 66 (11th Cir. 2010)

(per curiam) (unpublished) (quoting Crayton v. Callahan, 120 F.3d 1217, 1219 (11th

Cir. 1997) (citation omitted)); see also Brady v. Heckler, 724 F.2d 914, 920 (11th Cir.

1984) (per curiam) (citation omitted); <u>Hall</u>, 2009 WL 890389, at *6 (citation omitted);

<u>Watson v. Astrue</u>, No. 3:08-CV-70 (CDL), 2009 WL 902102, at *3 (M.D. Ga. Mar. 27,

2009) (citation omitted). Indeed, "[a] severe impairment is something that

significantly limits a claimant's ability to do basic work activities . . . ."[45] <u>Sassone v.</u>

<u>Comm'r of Soc. Sec.</u>, 165 F. App'x 954, 957 (3d Cir. 2006) (unpublished) (citation

omitted); <u>see also</u> <u>McCruter v. Bowen</u>, 791 F.2d 1544, 1547 (11th Cir. 1986) (citation

omitted). "If it is determined at step two that the claimant does not have a severe

medically determinable impairment or combination of impairments, that ends the

matter, because it results in a determination of non-disability." <u>Ponce</u>, 2010 WL

2104751, at *1. "Only if it is determined at step two that a severe impairment or

combination of impairments exists does the analysis proceed to the third step." <u>Id.</u>;

<u>see also</u> <u>Williams v. Astrue</u>, No. 08-23099-CIV, 2010 WL 1010868, at *4 (S.D. Fla. Mar.

15, 2010), adopted at *1.

"Although the claimant bears the burden of showing severity, the burden is

mild, such that a claimant need only show '[his] impairment is not so slight and its

---

[45] Basic work activities "include, but are not limited to: physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting." <u>Hendley v. Astrue</u>, No. 5:10–CV–398 (CAR), 2012 WL 1029491, at *2 n.1 (M.D. Ga. Mar. 5, 2012), adopted by 2012 WL 1019165, at *2 (M.D. Ga. Mar. 26, 2012) (citation omitted).

effect is not so minimal' as to be trivial." Salazar, 372 F. App'x at 66 (quoting McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986)). "However, to establish a severe impairment, a [claimant] must show more than the mere presence of a condition or ailment." Doerr v. Astrue, No. 2:07-CV-275, 2009 WL 200989, at *11 (E.D. Tenn. Jan. 27, 2009), adopted at *1 (citation and internal marks omitted).

Claimant argues that the ALJ erred at step two by determining that neither his PTSD nor his tinnitus were severe impairments. [Doc. 1 at 17, 19]. In particular, claimant contends that he suffers from "impaired short term and long term memory [which] should be considered . . . severe" and that "PTSD, PCS and PPCS (Prolonged PCS) are all considered mild traumatic brain injuries . . . or what is commonly called closed-skill [sic] brain injury symptoms [that] can persist for years." [Id. at 17]. With regard to his tinnitus, claimant contends that he was "fitted with white noise generators and given a regime to follow to assist in learning to ignore the ringing in the ears" and that while the treatment was useful, his "tinnitus never goes away" and that the "noise can act on you[r] concentration and memory problems, create stress that induces muscle tightening that increases back pain and induce [sic] irritability." [Id. at 19]. However, despite claimant's arguments to the contrary, there is substantial evidence in the record to support the ALJ's finding that claimant's PTSD and tinnitus were not severe.

Claimant has failed to point to any objective medical evidence of limitations that support his claim that these impairments were severe, and the evidence shows that claimant sought minimal treatment for these conditions with only sporadic complaints of any associated symptoms. Specifically, the record shows that in December of 2004, Dr. Houssami evaluated claimant's complaints of tinnitus and found that claimant had no evidence of external head trauma, had full range of painless motion of his neck, had normal cognitive functions, and had normal speech content and structure with no difficulty answering questions. (Tr. at 789-91). Dr. Houssami opined that claimant's tinnitus was a component of post-concussive syndrome of mild severity, and he recommended a neuropsychological evaluation. (Tr. at 790-91). Thereafter, claimant underwent a neuropsychological evaluation by Dr. Lacy in January of 2005, and she diagnosed claimant with PTSD, concluded that he did not have a traumatic brain injury, and referred him to psychotherapy to address any emotional difficulties associated with PTSD. (Tr. at 792-804). In October of 2005, claimant saw Dr. Roth for his tinnitus and Dr. Roth determined that claimant had tinnitus with "normal hearing and normal middle ear function," for which conservative treatment was warranted. (Tr. at 947).

Dr. Carter, a DDS non-examining psychological consultant evaluated the claimant using a PRT form in January of 2006 and he found claimant had no

medically determinable mental impairment. (Tr. at 959-72). In reaching this decision, Dr. Carter specifically noted that claimant's allegations regarding his memory and concentration issues were belied by the fact that he provided an "extremely lengthy ADL form," see (Tr. at 971), and that Dr. Roth had even noted in January of 2006 that claimant did not have any limitations in functioning secondary to any mental condition, (id.); see also (Tr. at 957). Dr. Carter further noted that even though claimant had attended a few counseling sessions, he had been discharged on the basis that his doctor did not believe he suffered from any mental condition and that claimant had even acknowledged that he did not have a mental health condition. (Tr. at 971). In August of 2006, Dr. Telford-Tyler, another DDS psychological consultant, affirmed Dr. Carter's findings. (Tr. at 1079). In fact, in May of 2007, claimant ranked his mood, energy, and motivation "as 7's" and reported that he had not been crying and had not felt like crying. (Tr. at 1099).

"'Disability' is defined in the Social Security Act as the 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a *continuous period of not less than 12 months*[.]'" Platt v. Astrue, No. 3:07-cv-1153-J-JRK, 2009 WL 513762, at *5 n.6 (M.D. Fla. Mar. 2, 2009) (quoting 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A)) (alteration in original) (emphasis

added); see also 20 C.F.R. § 404.1505(a). Even if claimant's medical conditions meet the durational requirement, "substantial medical evidence supports the ALJ's finding that these conditions, either alone or *en masse*, fail to rise to the level of a severe impairment." Sassone, 165 F. App'x at 957. Indeed, "[a] diagnosis alone is an insufficient basis for a finding that an impairment is severe." Sellers v. Barnhart, 246 F. Supp. 2d 1201, 1211 (M.D. Ala. 2002); see also Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988) (per curiam) (citation omitted). "Objective medical evidence must confirm that the impairment is severe." Sellers, 246 F. Supp. 2d at 1211 (footnote and citation omitted).

While claimant was diagnosed with PTSD and tinnitus, "[n]o reports indicate functional limitations for the [claimant] or limitations in his physical [or mental] abilities." Id. In fact, "there is no evidence that these impairments interfered with his ability to do basic work activities or that he continuously sought treatment for [these] impairments," Gibbs v. Barnhart, 156 F. App'x 243, 247 (11th Cir. 2005) (per curiam) (unpublished). Rather, the medical evidence shows that claimant's complaints were treated conservatively. See (Tr. at 790-91, 947, 957). Therefore, claimant "has not met his burden of showing that his impairments are more than a slight abnormality with more than a minimal effect on his ability to perform basic

work activities." Sellers, 246 F. Supp. 2d at 1211-1212; see also Dixon v. Barnhart, 151 F. App'x 810, 811-12 (11th Cir. 2005) (per curiam) (unpublished).

While claimant contends that his impaired short term and long term memory should be considered severe and that his tinnitus "can" act on his concentration and memory problems, [Doc. 1 at 17, 19], "[u]nder 20 C.F.R. § 404.1529(b), more than just [claimant's] subjective complaints of pain are needed to find that such pain constitutes a severe impairment," Sassone, 165 F. App'x at 957. "Here, [claimant's] subjective complaints of pain are not sufficiently supported by the necessary objective medical evidence to allow the ALJ to decide that [claimant's PTSD or tinnitus] constitute[]. . . severe impairment[s]." Id. at 957-58 (footnote omitted).

Indeed, the medical record shows claimant's course of treatment was intermittent and none of his treating or examining physicians placed any limitations on his activities as a result of his PTSD or tinnitus. See generally [Doc. 6]; see also Spradling v. Chater, 126 F.3d 1072, 1075 (8th Cir. 1997) (finding failure to seek more aggressive treatment and lack of continuous treatment inconsistent with complaints of disabling pain); Torres v. Sec'y of Health & Human Servs., 890 F.2d 1251, 1255 (1st Cir. 1989) (per curiam) ("The claimant sought no regular treatment for his two allegedly painful conditions . . . . On this record the ALJ was entitled to discount the severity of the pain complaints . . ."). Since nothing in the record indicates that

claimant's PTSD and tinnitus limit his ability to perform basic work activities, the ALJ's decision that these conditions were non-severe is supported by substantial evidence.[46]

## C.     The ALJ's credibility assessment is supported by substantial evidence

Claimant contends that all of his subjective complaints were supported by the evidence and that the ALJ erred by not finding his subjective complaints of pain to be fully credible.   [Doc. 1 at 20-26].   Testimony regarding claimant's pain and subjective limitations are evaluated under the standard set forth by the Eleventh Circuit in Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991) (per curiam):

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing:   (1) evidence of an underlying medical condition; and (2)

_____

[46] Moreover, any alleged error from the ALJ's failure to find claimant's PTSD or tinnitus severe is harmless since the ALJ continued on to the next step in the sequential analysis and ultimately made a decision at step four based on claimant's RFC to perform his past relevant work.   Indeed, "a continued analysis in the sequential step evaluation process can infer failure to articulate a finding at an earlier step was harmless error."   Farrington, 2010 WL 1252684, at *4 (citation omitted); see also Jackson, 734 F. Supp. 2d at 1361; Glover v. Astrue, Civil Action No. 2:07CV977-SRW, 2009 WL 1456688, at *3 (M.D. Ala. May 22, 2009).   Thus, the ALJ's finding at step two that claimant's PTSD and tinnitus were not severe was, at most, harmless error.   Glover, 2009 WL 1456688, at *3 (citation omitted); see also White v. Astrue, Civil Action No. 1:08-CV-0827-SRW, 2010 WL 1729113, at *5 (M.D. Ala. Apr. 28, 2010) (citation omitted) (citing McKiver v. Barnhart, No. 3:04CV1080(SRU)(WIG), 2005 WL 2297383, at *11 (D. Conn. Sept. 16, 2005) ("explaining that the failure to make explicit determination at step two is, at most, a harmless error when the ALJ does not screen out the plaintiff's claim at step two, but rather continues with the five-step sequential process")).

either (a) objective medical evidence confirming the severity of the alleged [limitations]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [limitations].

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam) (citing Holt, 921 F.2d at 1223); see also Pierson v. Comm'r of Soc. Sec., No. 12–11198, 2012 WL 5358978, at *2 (11th Cir. Oct. 31, 2012) (per curiam) (unpublished) (citation omitted). "If the ALJ discredits subjective testimony, [s]he must articulate explicit and adequate reasons for doing so." Wilson, 284 F.3d at 1225 (citing Hale, 831 F.2d at 1011). "Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true." Id. (citing Cannon v. Bowen, 858 F.2d 1541, 1545 (11th Cir. 1988)).

The ALJ's reasons for rejecting testimony regarding subjective symptoms must be supported by substantial evidence, and "where such testimony is critical, [s]he must articulate specific reasons for questioning the claimant's credibility." Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (per curiam) (citing Walker, 826 F.2d at 1004); Tauber v. Barnhart, 438 F. Supp. 2d 1366, 1380 (N.D. Ga. 2006). Factors considered when evaluating a claimant's subjective complaints of pain are set forth at 20 C.F.R. § 405.1529(a), which provides in relevant part:

(a) General.  In determining whether [claimant is] disabled, we consider all [claimant's] symptoms, including pain, and the extent to which [claimant's] symptoms can reasonably be accepted as consistent

with the objective medical evidence, and other evidence . . . . By other evidence, we mean the kinds of evidence described in §§ 404.1512(b)(2) through (8) and 404.1513(b)(1), (4), and (5) and (d). These include statements or reports from [claimant], [claimant's] treating or nontreating source, and others about [claimant's] medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how [claimant's] impairment(s) and any related symptoms affect [claimant's] ability to work. . .

20 C.F.R. § 404.1529(a); see also Dyer, 395 F.3d at 1212 (finding that ALJ "adequately explained his reasons" for discrediting claimant's pain testimony where "the ALJ considered [claimant's] activities of daily living, the frequency of his symptoms, and the types and dosages of his medications, and concluded that [claimant's] subjective complaints were inconsistent with his testimony and the medical record"); Sewell v. Bowen, 792 F.2d 1065, 1068 (11th Cir. 1986) (citation and internal marks omitted) ("[T]he fact finder must evaluate the credibility of claimant's testimony as to pain, and must express a reasonable basis for rejecting such testimony."); White v. Barnhart, 340 F. Supp. 2d 1283, 1285 n.6 (N.D. Ala. 2004) (quoting SSR 96-07p, 1996 WL 374186, at *2 (July 2, 1996)) ("'The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'"). "However, the above factors cannot alone establish that [claimant] is disabled; there must be objective medical evidence that

demonstrates the existence of a medical impairment or impairments which could reasonably be expected to produce pain in the severity claimed by [claimant]." White v. Apfel, No. Civ.A. 99-0416-RV-S, 2000 WL 724410, at *7 (S.D. Ala. May 15, 2000) (citations omitted).

The ALJ properly discredited claimant's pain testimony by acknowledging his alleged limitations, but finding that while "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of the these symptoms are not fully credible." (Tr. at 11). The ALJ explained in relevant part:

> At the hearing, the claimant testified he last worked as a software support specialist, at home, and stopped working after injuring his neck and lower back in a motor vehicle accident on October 30, 2004. The claimant testified he has headaches, severe arm and leg pain, difficulty walking and tires easily. He has asthma and uses inhalers, on an "as needed" basis. He stated that he takes pleasure in smoking cigarettes with no intention to quit. The claimant has difficulty sleeping some nights and takes medication for this which is also an anti-depressant. He stated the side effects of his medications diminish his memory and concentration. He testified he can stand for approximately one hour to one hour and a half, sit for about the same amount of time, walk approximately thirty minutes a day, and lift ten to fifteen pounds. He testified he no longer engages in knitting and crocheting hobbies, has had difficulty opening jars and has dropped glasses. He can sit for one hour at the computer and check e-mails.
>
> When questioned about his daily activities, the claimant testified he is able to perform housework, including using cookbook recipes to prepare meals. He drives an automobile and shops for groceries approximately thirty minutes at a time. On a typical day he awakens,

takes medication, fixes breakfast, checks e-mails, washes and folds laundry, watches television, and lies down and may fall asleep for approximately one and half to two hours.  He testified that he may sit up for three hours, but then would have to lie down, for a total of approximately five hours in an eight hour day, due to pain.

(Id.).

In particular, while claimant takes issue with the ALJ's characterization of his testimony concerning his headaches and severe arm and leg pain; his daily activities, including that he performed housework, prepared meals from a cookbook, shopped for groceries, and drove an automobile; his typical day, particularly, that he fixed breakfast or washed and folded his laundry; and that she noted that he was a smoker who ignored his doctors' advice to quit, see [Doc. 1 at 20-26], a review of claimant's testimony and the medical records reveal that there is nothing inconsistent about the ALJ's characterization in this regard.  In fact, claimant clearly testified that he suffered from headaches and pain with the use of his arms, hands, and legs, see (Tr. at 24, 34-35);[47] that he could perform certain household chores such as the doing the laundry and preparing his meals, (Tr. at 30-31); and that he drove limited distances, (Tr. at 31).  While claimant takes issue with the characterization that he may wash and fold the laundry everyday or that fixing breakfast means

_____

[47] In fact, claimant completed a disability report in November of 2006 in which he reported that he was suffering from arthritis in the joints of his fingers in both hands and experienced pain using his hands.  (Tr. at 189-90).

anything other than simply "pulling the foil top off of a 8 oz. container of yogurt, or a cold or warm bowl of cereal, perhaps a couple of eggs with buttered toast and a couple of fully cooked bacon warmed up in the microwave," [Doc. 1 at 24], he does not dispute that he can and does actually perform these activities and therefore, the ALJ did not misrepresent his testimony in this regard and her findings are entirely consistent with claimant's testimony at the hearing.

Furthermore, "[t]he question is not . . . whether [the] ALJ could have reasonably credited [claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." Werner v. Comm'r of Soc. Sec., 421 F. App'x 935, 939 (11th Cir. 2011) (per curiam) (unpublished). The ALJ's credibility findings were both explicit and supported by citation to specific evidence that provided a reasonable basis for partially rejecting claimant's testimony. Dyer, 395 F.3d at 1212; Wilson, 284 F.3d at 1226; Veasey v. Astrue, Civil Action No. 1:06-CV-1909-AJB, 2008 WL 504388, at *9-10 (N.D. Ga. Feb. 21, 2008); see also Lanier v. Comm'r of Soc. Sec., 252 F. App'x 311, 314 (11th Cir. 2007) (per curiam) (unpublished) (affirming ALJ's adverse credibility determination where claimant's description of her activities was inconsistent with her testimony regarding pain); Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996) (citations omitted) ("The ALJ may discount the claimant's allegations of pain when he explicitly finds them inconsistent with daily activities, lack of treatment,

demeanor, and objective medical evidence."). The ALJ therefore committed no error in finding that claimant was not entirely credible as to his allegations of pain and functional limitations, and "substantial evidence cited by the ALJ supports the adverse credibility determination." Werner, 421 F. App'x at 938; see also Levy v. Astrue, No. 07-80157-CIV, 2008 WL 4753518, at *22 (S.D. Fla. Oct. 28, 2008), adopted at *1. Thus, this claim is likewise without merit, and the Court finds that the ALJ's credibility assessment is supported by substantial evidence.

## VII. CONCLUSION

For the reasons stated, it is hereby **RECOMMENDED** that the Commissioner's final decision denying claimant's application for DIB be **AFFIRMED**.

The Clerk is hereby **DIRECTED** to terminate this reference.

**IT IS SO RECOMMENDED**, this 11th day of January, 2013.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE